Sharon **PFEIFFER**, Plaintiff,

v.

**LEWIS COUNTY; Joann Doney, Ralph Farney, Roxainna Hurlburt, John LaDuc, Devere Rumble & Dale Roberts, all in their individual capacities & Lewis County Sheriff, Gary Jock, in his official capacity, Defendants.**

No. 01–CV–1053.

United States District Court, N.D. New York.

March 17, 2004.

Koob & Magoolaghan, (Joan Magoolaghan, Esq., Katherine R. Rosenfeld, Esq., of Counsel), New York City, for Plaintiff.

Hicock, Barclay Law Firm (Alan R. Peterman, Esq., of Counsel), Syracuse, NY, for Defendants Lewis County Joann Doney, Ralph Farney, and Roaxainna Hurlburt.

Petrone, Petrone Law Firm (David A. Bagley, Esq., of Counsel), Utica, NY, for Defendant Jock.

Sugarman Law Firm (Kevin Todd Hunt, Esq., of Counsel), Syracuse, NY, for Defendant LaDuc.

Melvin, Melvin Law Firm (Michael R. Vaccaro, Esq., of Counsel), Syracuse, NY, for Defendants Rumble and Roberts.

### MEMORANDUM—DECISION and ORDER

McAVOY, Senior District Judge.

Plaintiff Sharon Pfeiffer commenced the instant action asserting various claims pursuant to 42 U.S.C. § 1983; 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 29 U.S.C. § 206, *et seq.* (the "Equal Pay Act" or "EPA"), N.Y. Labor Law § 194 (the "New York Equal Pay Act") and N.Y. Exec. Law § 296 (the "New York State Human Rights Law" or "HRL"), arising out of her employment with Defendant Lewis County (the "County"). Plaintiff also asserts a common law claim of defamation. Currently pending before the Court are: (1) Defendant John LaDuc's ("LaDuc") motion for summary judgment; (2) Defendants Devere Rumble ("Rumble") and Dale Roberts' ("Roberts") motion for summary judgment; (3) Defendant Gary Jock's ("Jock") motion for summary judgment; (4) Defendants Lewis County, Joann Doney ("Doney"), Ralph Farney ("Farney"), and Roxainna Hurlburt's ("Hurlburt") motion for summary judgment; and (5) Plaintiff's appeal of the January 30, 2004 Order of the Magistrate Judge denying Plaintiff leave to file a Supplemental Second Amended Complaint.

## I. FACTS

Plaintiff was hired by the Lewis County Sheriff's Department ("LCSD") as a "Dispatcher/Jail Guard" in 1986. In 1994, the title of Plaintiff's position was changed from "Dispatcher/Jail Guard" to "Dispatcher/Correction Officer" ("D/CO"). Plaintiff's position is a civil service position. Jock. SMF at ¶ 8.[1] The D/CO position requires Plaintiff to perform the duties of an emergency services dispatcher, serve in the control room (or dispatch center), and to perform certain duties pertaining to the supervision and monitoring of female inmates at the Lewis County Jail. Plaintiff received training as a corrections officer and as an emergency medical dispatcher.

---

1. "SMF" refers to the statement of material facts required by N.D.N.Y.L.R. 7.1(a)(3). Defendant Lewis County's SMF will be referenced as "LC SMF", Defendant Jock's SMF will be referenced as "Jock SMF." Plaintiff's SMF will be referenced as "Pl.'s SMF." Unless otherwise noted, Defendants' SMFs are cited only where Plaintiff has admitted the allegation. For further discussion of this issue, see note 2 *infra.*

The primary responsibility of full-time corrections officers ("COs") is to oversee, monitor and supervise inmates being held in the Public Safety Building. LC SMF ¶ 4. Male inmates are housed in the cell block. *Id.* at ¶ 6. COs are assigned to the cell block and spend their work day in the common area of the cell block. *Id.* ¶ 5. Female inmates are housed in holding cells. *Id.* at ¶ 7. The holding cells are located outside the cell block across a hallway from the dispatchers' location. *Id.* at ¶ 8. COs make routine rounds of the cell block and the holding cells outside of the formal cell block. *Id.* at ¶ 9. COs perform body and strip searches on all male inmates when they return to the cell block. *Id.* at ¶ 11.

As the name suggests, D/COs have a dual function—dispatching duties and corrections officer duties. The vast majority of the D/COs day is spent in the dispatch center, a secure room located outside of the cell block. *Id.* at ¶ 15.[2] D/COs normally sit in an office chair at a telephone console that they use to perform their functions. *Id.* at ¶ 16. The D/COs also monitor the female inmates in the holding cells. *Id.* at ¶ 19. The holding cells are visible from the dispatch center and can be monitored without the D/COs leaving the dispatch center. *Id.* at ¶ 20. The only time that a D/CO has any contact with a prisoner is if a female prisoner needs to be strip searched or if a female prisoner has a problem that would not be appropriate for a male CO to handle. *Id.* at ¶ 21. D/COs do not routinely performs rounds of the cell blocks or the holding cells, they do not routinely interact with the male prisoners, and they rarely enter the cell block. *Id.* at ¶¶ 22–23.

For purposes of compensation, D/COs are classified as Grade 18 positions and receive between $13.13 and $15.15 per hour. *Id.* at ¶ 25. COs are classified as Grade 23 positions and receive between $14.92 and $17.55 per hour. *Id.* at ¶ 26. The pertinent collective bargaining agreement ("CBA") in effect from 1997–1999 provided that "[a] $2.00/hr. increase shall be added to the dispatchers regular rate of compensation while acting as guard to a female inmate. A minimum of 4 hours must be worked exclusive of call in time before compensation will be granted." Pl.'s Ex. 10, p. 7. The 2002–2004 CBA changed this section. That CBA provides that "[i]n the event that a [D/CO] ... is acting as a Correction Officer with respect to a female inmate, the [D/CO] ... on duty with the most seniority shall receive a $2.00/hr. increase in her regular rate of compensation." Pl.'s Ex. 18, p. 7. The 2002–2004 CBA further provides that: "[i]n the absence of a ... shift supervisor in dispatch, ... the employee ... with the highest seniority shall receive Sergeant's rate of pay, at the same step as the employee's regular pay." *Id.*

---

2. In numerous instances, Plaintiff admits to only a portion of one of Defendants' statement of material facts. For example, in statement 15, Lewis County asserts that "Dispatcher/Correction Officers spend the vast majority of their day in the Dispatch Center, an air conditioned room outside of the cell block...." LC SMF at ¶ 15. In response, Plaintiff states that she "[a]dmits that the entire jail, including the Control Room, is air conditioned." Plaintiff's response to LC SMF ¶ 15. This is an incomplete admission/denial. In those instances where Plaintiff makes an incomplete admission/denial, the evidentiary support for Plaintiff's position does not relate to the matters not admitted by Plaintiff. *Id.*

In the absence of a citation to any evidence directly refuting Defendants' assertions in their statements of material facts, the entirety of Defendants' statement will be deemed to be true, regardless of the fact that Plaintiff attempts to make a partial admission. *See* N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") (bold emphasis added, underlining in original). Thus, in the above example, the Court will deem Plaintiff to have admitted that D/COs spend the vast majority of their day in the dispatch center, outside of the cell block.

In October 1999, then Lewis County Sheriff Gary Jock provisionally appointed Plaintiff to be the dispatch supervisor.[3] Jock SMF at ¶ 14. At that time, Plaintiff discontinued performing the job responsibilities of a D/CO. Plaintiff was moved out of the control room and placed in an office. Plaintiff did not receive a salary increase for the new position. Jock SMF at ¶ 15. Shortly thereafter, Dennis Lawlee ("Lawlee"), the Sheriff Department's Chief Civil Deputy, announced his intention to retire. Pl.'s SMF at ¶ LC 28. Jock directed Plaintiff to assume some of the work that had been performed by Lawlee. To compensate Plaintiff for this additional work, in February 2000, Plaintiff was given the part-time position of "Secretary to the Sheriff" and paid additional wages. Pl.'s SMF at ¶ 36. During this time, Plaintiff also maintained her position as dispatch supervisor. *Id.*

In March 2000, the union filed a grievance alleging that the Sheriff had given Plaintiff a $10,000 per year increase above the negotiated salary level without bargaining with the union. LC SMF at ¶ 29. The union and the County ultimately reached a resolution whereby the County discontinued paying Plaintiff "any wages or salary in excess of that specified by the Collective Bargaining Agreement." Peterman Aff., Ex. K. Pursuant to the settlement, the County could contract with Plaintiff to perform duties in addition to those performed as a D/CO. *Id.* In June 2000, Plaintiff and the County entered into an Administrative Services Agreement ("ASA") pursuant to which Plaintiff continued to perform some of the functions of the Chief Civil Deputy and, in exchange,

received $10,000 annually. Peterman Aff., Ex. L.

By its terms, the ASA expired in May 2001. *Id.* Although Plaintiff continued to perform work under the ASA beyond May 2001, the County declined to renew the agreement and Plaintiff did not receive any additional compensation for work performed in May, June and July, 2001.

Plaintiff contends that, throughout her employment at the LCSD, she actively and openly campaigned for pay equality for the D/COs, for supervisor's pay for herself, and for other equal terms and conditions of employment for female employees of the LCSD. Plaintiff alleges that, in response to her efforts, she was confronted by hostility, aggression and malevolence by male members of the LCSD. Plaintiff maintains that, commencing at the time that LaDuc was appointed Undersheriff in June 2000, she was subjected to a campaign of harassment against her and other female employees by LaDuc and Defendants Rumble and Roberts. Plaintiff states that she was subjected to: daily offensive and malicious comments about her appearance; condescending remarks about her and her office; comments referring to her office as the "Barbie House;" comments referring to the female workers as "cute bitches", "ugly bitches" and/or "fat bitches;" disparaging remarks concerning the dispatchers' ages, weight and/or dress; having her work "sabotaged;" demands that she be removed from her supervisory position and replaced with a male employee; and allegations that she was having an affair with Jock, which was claimed to be the reason she was appointed to the dispatch supervisor position. Plaintiff further alleges that LaDuc recommended that she wear a

---

3. It is disputed whether Plaintiff was formally appointed to be the dispatch supervisor. Defendants contend that no such position existed in 1999. Defendants do not, however, deny the ensuing facts concerning the change in Plaintiff's job responsibilities and her relocation to an office.

D/CO uniform, instead of be permitted to wear "street" clothes.[4]

In August 2001, Plaintiff requested to use sick bank time from the Lewis County Sick Leave Bank. Plaintiff contributed to the sick leave bank for over ten years. Her request was denied. In November 2001, Plaintiff was returned to her position as a D/CO and resumed performing the duties attendant to that position.

As of January 1, 2004, LaDuc again became Undersheriff. On one of his first days back at the LCSD, LaDuc stated to Plaintiff that "I used to be a little prick, but now I'm taking Viagra." LaDuc also has "tapped" Plaintiff in the head. Plaintiff also has been required to work weekends, whereas prior to January 2004, she consistently had all weekends off.

## II. STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477

U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). With this standard in mind, the Court will address the defendant's motion.

## III. DISCUSSION

### a. Expert Witness

Lewis County seeks to exclude the opinions of Plaintiff's proffered expert witness. Plaintiff retained an expert to provide an opinion concerning whether the D/CO and CO positions are substantially equal, one of the elements of her EPA claim. In support of her conclusion, the expert relied upon the 2002–2004 CBA, documents produced by Defendants pursuant to Plaintiff's discovery demands, the D/CO and CO job descriptions, certain pages from a New York State Commission of Corrections investigation of the LCSD, the LCSD's chain of command, job descriptions from surrounding counties, Plaintiff's Second Amended Complaint, and the expert's one day inspection of the LCSD.

---

4. Upon being elevated from the D/CO position to the dispatch supervisor position, Plaintiff was no longer required to wear a uniform.

Rule 702 of the Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Rule itself provides, the initial inquiry is whether "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *See United States v. Cook*, 922 F.2d 1026, 1036 (2d Cir.1991) ("Expert testimony is only admissible when such testimony is helpful to the trier of fact.... Such testimony is unnecessary where the jury is capable of comprehending the facts and drawing the correct conclusions from them.... Indeed, the judge in his discretion may exclude expert testimony when it is not helpful to the jury."). The Second Circuit has instructed that "the district court should not admit testimony that is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'" *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir.2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir.1991)), *cert. denied*, 535 U.S. 949, 122 S.Ct. 1344, 152 L.Ed.2d 247 (2002); *see United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."). It is within the discretion of the trial court to determine whether expert testimony will assist the trier of fact. *United States v. Aminy*, 15 F.3d 258, 261 (2d Cir.1994) ("The decision to admit testimony under this Rule is left to the trial court's discretion and will be overturned only if 'manifestly erroneous.'") (quoting *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir.1989)).

In this case, the Court finds that, with one limited exception, the proposed expert witness would not be helpful to the trier of fact. The trier of fact is perfectly capable, on its own, to evaluate the various information relied upon by the expert (as outlined above) to ascertain whether the D/CO and CO jobs are substantially equal. *See, e.g., Patterson v. McLean Credit Union*, 805 F.2d 1143, 1147 (4th Cir.1986) (holding that a jury does not need aid in determining the relative qualifications of clerical employees at a credit union), *vacated in part on other grounds*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). There is nothing complicated about the evidence in this case such that it would be helpful to the trier of fact to have assistance from an "expert." For example, the first item in the expert's report is an "Analysis of the Lewis County Sheriff's Department's CO and D/CO Job Descriptions." In this section, Plaintiff's proffered expert simply compares the two job descriptions and then offers her opinion that certain responsibilities imposed only upon the D/CO position "more than offset" certain responsibilities only imposed upon the CO position. The trier of fact is perfectly capable of reviewing the job descriptions and forming its own conclusions concerning the relative equality of the positions without help.

In the second section of the report, the expert next analyzes "working conditions and hazards." In this section of the report, the expert offers her opinion con-

cerning the relative stresses and hazards of the D/CO and CO positions. Once again, there is nothing in this section that is helpful to the trier of fact. Plaintiff can submit evidence to the trier of fact concerning the risks attendant to the D/CO and CO positions and the trier of fact can weigh any differences. A trier of fact is perfectly capable of understanding the stresses associated with handling emergency calls, multi-tasking, strip searching female inmates, etc. The trier of fact similarly can make its own conclusion concerning whether the stresses and hazards faced by D/COs are equivalent to those faced by the CO. Significantly, the expert's conclusion in this regard is not purported to be based upon any scientific, technical or other specialized knowledge, but purely upon the expert's personal opinion.[5]

The third, and final, section of the report pertains to how the LCSD establishes its salaries. The proffered expert notes that employers frequently look to other employers to ascertain "external equity" and establish their own internal procedures to assure "internal equity." With respect to "external equity," the proffered expert looked at the job description and pay of similar positions in surrounding counties. Once again, the trier of fact is perfectly competent to review this same information and draw its own conclusions concerning the similarity of job requirements and the equality of pay for similar jobs.

■ With respect to "internal equity," the expert notes that because "the LCSD has provided no documents concerning their institutional processes for deciding internal equity ... it appears that Lewis County lacks any system for classifying jobs and determining the internal consistency of compensation. In my opinion, the absence of institutional classification and compensation processes addressing internal salary consistency is a deviation from accepted procedures for both public and private sector employers that leaves the County's salary setting open to subjectivity and could lead to the discriminatory assignment of compensation levels to job titles." It likely is not within the ordinary purview of lay triers of fact whether accepted procedures call for an institutional classification and compensation process to address internal salary consistency. In this regard, expert testimony may be help-

5. The second section of the report also raises reliability issues. In fact, the expert's conclusion with respect to this section appears to be based upon conjecture and surmise—an insufficient basis upon which to admit expert testimony. The expert states in paragraph 14 of her report as follows:

Although **I am not specifically educated on the Inherent dangers** for Control Room Officers, it appears to me that while the dangers from inmates might be less than for the COs, the dangers from those on the outside of the facility **could be greater**. Any revengeful former inmate or other person planning to gain forced entry to the jail facility and/or the Sheriff's offices would first need to confront the Control Room Officer and staff. In this day of much talk about terrorism and explosives, the Control Room staff could be targeted.
(emphasis added).

These conclusions are entirely unsupported and, thus, unreliable. First, the expert admits lacking knowledge concerning the dangers facing control room officers. Second, the proffered expert offers no factual or other basis (other than conjecture) upon which to conclude that there are any real dangers from outside the facility such that the harm faced by D/COs is equal to or greater than that faced by COs. Third, the expert makes no effort to quantify the differences in hazards facing D/CO as opposed to COs. For example, there is evidence in the record that Plaintiff spent approximately 20 minutes per week strip-searching the few female inmates housed in the jail. Assuming female and male inmates pose the same danger (an assumption that is admittedly questionable), the risk associated with this task is necessarily greater for the COs who spend a greater portion of their time performing strip searches.

ful. Accordingly, the Court will allow the expert to testify on this limited issue.

In sum, the LC Defendants' motion to preclude the expert testimony is granted in part and denied in part. The trier of fact is perfectly capable, without assistance, of reviewing and comparing the various job descriptions and analyzing any evidence concerning the actual job functions of the D/CO and CO and to formulate its own conclusions concerning the similarity (or dissimilarity) of these positions. The trier of fact is similarly capable of understanding and analyzing any external pay equity issues without the help of an expert.[6] It would, however, be helpful to the trier of fact to have expert assistance concerning the accepted procedures for determining internal pay equity. Thus, the expert will be permitted to testify on this limited issue of internal pay equity.[7]

### b. Equal Pay Act [8]

■ "To prove discrimination under the Equal Pay Act, a plaintiff must show that: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.' " *Lavin–McEleney v. Marist College,* 239 F.3d 476, 479 (2d Cir.2001) (quoting *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999)); *see also* 29 U.S.C. § 206(d)(1).

[T]he EPA does not require a plaintiff to establish an employer's discriminatory intent.

Instead, the EPA makes it illegal for an employer to pay unequal compensation to those of different genders for equal work, "except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Belfi,* 191 F.3d at 136 (citing *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 526 (2d Cir.1992)).

*Ryduchowski v. Port Auth. of New York and New Jersey,* 203 F.3d 135, 142 (2d Cir.2000).

### 1. Whether the LCSD Pays Different Wages to Employees of the Opposite Sex

The first element of an EPA claim is whether the employer pays different wages to employees of the opposite sex. Here, there is evidence in the record from

---

**6.** It is unclear how or why "external equity" has any relevance to this case involving alleged disparate pay between females and males **within** the LCSD.

**7.** This limited issue of internal pay equity procedures and processes is not to be used as a "back door" into the issue of whether the D/CO and CO positions are substantially equal. The expert testimony should be limited to the significance of internal pay equity procedures, the accepted procedures for using (or not using) internal pay equity procedures, how such procedures are implemented,

and whether the LCDS has implemented any such procedures.

**8.** New York's Equal Pay Act is analyzed under the same standards applicable to the federal Equal Pay Act. *See Kent v. The Papert Companies, Inc.,* 309 A.D.2d 234, 246, 764 N.Y.S.2d 675 (1st Dept.2003); *Mize v. State Div. of Human Rights,* 33 N.Y.2d 53, 56, 349 N.Y.S.2d 364, 304 N.E.2d 231 (1973). Accordingly, the ensuing discussion addresses Plaintiff's claims under both statutes.

which a fair-minded trier of fact could reasonably conclude that the LCSD pays different wages to employees of the opposite sex. For example, there are male COs who are paid at Grade Level 23 and female D/DOs who are paid at Grade Level 18. Thus, this first element is satisfied.

### 2. Whether the Employees Perform Equal Work on Jobs Requiring Equal Skill, Effort, and Responsibility

■ The second element of an EPA claim is whether the employees perform equal work on jobs requiring equal skill, effort, and responsibility. "With regard to the second point, '[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are substantially equal' in skill, effort, and responsibility." *Lavin*, 239 F.3d at 479 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995)). "[W]here jobs are merely comparable, an action under the Equal Pay Act will not lie." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir.1993). "[T]he standard under the Equal Pay Act is job content and not job title or description." *Tomka*, 66 F.3d at 1310. Often, "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury." *Lavin–McEleney*, 239 F.3d 476, 480. Of course, there will be circumstances where the evidence in the record is such that no fair-minded trier of fact could reasonably conclude that the two positions are substantially equivalent and, thus, summary judgment will be proper.

#### a. The D/CO and CO Positions

Here, there is no question that there is substantial similarity between the *job descriptions* of the CO and D/CO positions. The D/CO Job description contains many of the same functions as the CO position. This is because D/COs are responsible for supervising female inmates. Indeed, the D/CO position contains many requirements not contained in the CO job description. However, as discussed, job descriptions are not dispositive. The relevant inquiry is what the employees actually do on the job. 29 C.F.R. § 1620.13(e).

■ There also is no question that, while supervising female inmates, D/COs actually do perform some of the same job functions as COs such as, for example, performing strip searches. While this suggests that there is substantial equivalency in the skill required of the two positions, it does not mandate a finding that the positions are substantially similar. "While it is undisputed that there ... [is some] common ground in their general job tasks .... the performance of some common tasks does not make jobs substantially equal when material differences also exist." *Conigliaro v. Horace Mann School*, 2000 WL 45439, at *8 (S.D.N.Y. 2000). The undisputed evidence before the Court is that, among other things, COs are required to book inmates, screen visitors, inspect cells and their occupants every half-hour, check cells for contraband, transport inmates, supervise the visitation and recreation areas, strip search male inmates, and perform checks on the female inmates every half-hour. LCSD's Ex. H at pp. 25–27, 32, 35–37. There is no evidence that Plaintiff or the other D/COs actually perform any of these functions. *See* LCSD SMF at ¶¶ 9, 10, 11, 12, 16, 20, 21, 22, 23;[9] Pl.'s Aff. at ¶¶ 4 ("I perform *particular* [CO] ... duties pertaining to

9. It will be recalled that most of the facts contained in the Lewis County Defendants' SMFs are deemed admitted because either: (1) Plaintiff admitted to the fact; or (2) Plaintiff failed to specifically refute the fact and provide a citation to the record in support thereof as required by the local rules.

the supervision and monitoring of female inmates.") (emphasis supplied); 6, 9 ("D/COs spend the majority of their time in the Control Room, a/k/a Dispatch Office."). In fact, at her deposition, Plaintiff testified that she does not perform routine checks on the female prisoners, she is not required to enter the main cell block area (where the male prisoners are housed), she does not perform cell checks, and she does not move any inmates (female or male) to visitation, outdoor recreation, or elsewhere. LCSD Ex. I at 63–64, 66, 67, 73–74. While the D/COs are responsible for "maintaining constant visual supervision over the [female] inmates [in the holding cell area]," Pl.'s Aff. at ¶ 6, this consists of monitoring the cameras from the dispatch center, whereas the COs are required to operate from within the cell blocks or holding areas with physical contact with the inmates. LCSD Ex. I at p. 53. The undisputed testimony in the record is that the D/COs' only physical contact with prisoners is with female prisoners that need to be strip searched, "or if a female prison has a problem that would not be appropriate for a male Corrections Officer to handle." Rounds Aff. at ¶ 15, LCSD SMF at ¶ 21. Plaintiff testified that her contact with the female prisoners consists of performing approximately two to five strip searches a week, which takes approximately five minutes per inmate. LCSD Ex. I at pp. 60–61. Thus, she devotes approximately 25 minutes of her workweek strip searching female inmates. Significantly, aside from continually pointing to the job descriptions and her duties of strip searching female inmates and maintaining visual surveillance of various portions of the jail, Plaintiff does not specify any other functions she performs that are similar to the

those of the CO position. *See, e.g.,* Pl.'s SMF at p. 4, ¶¶ 14, 15; pp. 26–28. To the contrary, the evidence in the record demonstrates that COs have primary responsibility for interacting with inmates and supervising the jail, while the D/COs are primarily responsible for performing dispatching duties. Moreover, there are significantly fewer female inmates than male inmates. The correctional facility can accommodate up to forty-two male inmates and two female inmates. Rounds Aff. at ¶ p 6, 17. According to Plaintiff, the most female inmates ever incarcerated in the holding cell area at one time was five. Pl.'s Aff. at ¶ 6. Thus, at the most, the D/COs would be required to *monitor* a maximum of five female inmates, whereas the COs would be required to *supervise* up to forty-seven male and female inmates.[10]

Notwithstanding the similarities of the job descriptions and training requirements for the two positions, the only conclusion that could be reached from the evidence in the record is that there is a sharp divergence of actual job duties between the D/CO and CO positions. Although Plaintiff makes much of the fact that D/COs are ready and able to fill in as COs and that the D/COs training as corrections officers enables the LCSD to comply with various state law requirements, "[t]he EPA does not mandate equal pay for equal competence, effort or intrinsic worth." *Conigliaro,* 2000 WL 45439, at *5.

Plaintiff also points to the fact that, pursuant to N.Y. County Law § 652(2), "[a] female correction officer or female deputy sheriff who is authorized to perform correctional duties and has completed training, as mandated by the state commission of correction, shall be in attend-

---

**10.** It should be recalled that the D/COs merely monitor the female inmates from the control room. Aside from performing strip searches on female inmates and other gender sensitive functions, they do not have any hands-on interaction with any of inmates and they are not required to enter the cell block or holding areas.

ance in a correctional facility when females are confined in the correctional facility and shall, when deemed necessary by the sheriff or keeper of the jail to maintain the order and security of the facility, be in attendance in any housing unit where females are confined." This statute says nothing about the duties actually performed by the LCSD's D/COs. By its plain terms, and as Plaintiff concedes in her memorandum of law, *see* Pl.'s Mem. of Law at 12 n. 6, all this statute requires is that a female CO be in attendance; it does not require her to actually do anything. The fact remains that there is no evidence from which a fair-minded trier of fact could reasonably conclude that the D/COs actually perform the same, or substantially equivalent, work as COs. This compels a finding that there is not substantial equality between the D/CO and CO positions and Plaintiff's EPA claim in this regard must, therefore, be dismissed.

### b. The Secretary and Dispatch Supervisor Positions

Defendants did not move for summary judgment concerning the Secretary to the Sheriff and dispatch supervisor positions. In her memorandum of law in opposition to the motions for summary judgment, Plaintiff raises these claims and indicates what she intends to prove at trial. Pl.'s Mem. of Law at 16 n. 9. In reply, Defendants make arguments why these two other claims should be dismissed.

Although the Court frowns upon new arguments being raised in reply papers, the issue was raised by Plaintiff in her opposition papers. Defendants then attempted to respond to the issues raised by Plaintiff. Rather than consider the argument waived, the Court will exercise its discretion and permit further briefing limited to the issues concerning the Secretary to the Sheriff and the dispatch supervisor positions. *See Booking v. General Star Management Co.,* 254 F.3d 414, 418 (2d Cir.2001). If Defendants wish to pursue these issues, they may file and serve a memorandum of law not to exceed ten pages within eleven business days of the date of this Decision & Order. Plaintiff shall then have eleven business days from the date Defendants file and serve their memorandum of law in which to file a memorandum of law in opposition. No reply will be permitted.

### 3. Whether the D/CO and CO Jobs are Performed Under Similar Working Conditions

Assuming, *arguendo,* that the work of the D/CO and COs are substantially equal, their working conditions are not. "The term 'similar working conditions' encompasses two subfactors: 'surroundings' and 'hazards.'" 29 C.F.R. 1620.18(a). "'Surroundings' measures the elements . . . regularly encountered by a worker, their intensity and their frequency." *Id.* "'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause." *Id.* It is difficult to conceive how the working conditions and, in particular, the hazards of the D/CO and CO positions can be considered to be similar. As discussed, the COs work directly with the inmates in the cell blocks, *see* LCSD's Ex. H at p. 26, whereas the D/COs work primarily in the secure control room. *See* LCSD SMF at ¶¶ 15, 16, 21. Plaintiff does not point to any evidence, admissible in form, from which a fair-minded trier of fact could reasonably conclude that the working conditions are similar.[11] For this

---

**11.** Plaintiff points to the report of her expert in support of her claims concerning the simi-

larity of working conditions. As previously noted, the expert report is inadmissible in this

reason too, Plaintiff's EPA claim concerning the D/CO and CO positions must be dismissed.

### c. TITLE VII AND THE NEW YORK HUMAN RIGHTS LAW [12]

#### 1. Discriminatory Wage Setting

■ Plaintiff claims that the County violated Title VII by intentionally paying discriminatory wages to the D/COs, including Plaintiff. In support of this argument, Plaintiff argues that the D/COs requested that the County Legislature raise their pay from grade 16 to grade 21 (the level at which COs are paid), that "male members of the Sheriff's Department became very outraged because they did not believe that dispatcher/correction officers, who were primarily female, should earn the same amount of money as them," the Legislature reviewed pay scales in surrounding areas, and the Legislature ultimately decided to raise the pay grade from 16 to 17. According to Plaintiff, the wage setting methodology was discriminatory because the wages were determined "on the basis of what 'upsets' male members of the Sheriff's Department." Pl.'s Mem. of Law at 20.

■ To make out a Title VII claim in this regard, Plaintiff must "produce evidence of discriminatory animus." *Belfi*, 191 F.3d at 139 (quoting *Tomka*, 66 F.3d at 1313). Plaintiff has failed to submit any evidence from which a fair-minded trier of fact could reasonably conclude that the County intentionally set wages for female employees lower than those of male employees. In fact, the sole evidence relied upon by Plaintiff reveals that the concern in setting wages had nothing to do with gender, but whether D/COs should receive the same wages as the road patrol and/or corrections officers. Pl.'s Ex. 87 at pp. 108–120.[13] For example, Defendant Hurlburt, a County legislator, testified at deposition that:

> My whole feeling on it was right from the beginning was they objected to dispatch having the same pay scale as road patrol. Their statement to me was that as road patrol they were subject to personal injury at any time and dispatch did not have that exposure and they didn't feel that we should have—we should consider making dispatch and road patrol on the same level. It didn't have anything to do with who, you know, sex it was, they didn't want the pay the same because they didn't feel that the exposure was the same. Which is the reason we did the comparison with dispatch in other counties.

*Id.* at 108.

This is corroborated by the affidavit of Donald Sawyer, submitted by Plaintiff. In his affidavit, Sawyer states as follows:

> I observed that male members of the Sheriff's Department became very outraged because they did not believe that [D/COs], who were primarily female,

regard. Even assuming the report was admissible, there is no foundation for the expert's conclusions concerning any hazards facing D/COs. As the expert herself admits, "I am not specifically educated on the inherent dangers for Control Room Officers." Pl.'s Ex. 7 at ¶ 14. The claimed hazards attributable to the D/CO position is based solely upon the expert's belief and suppositions and not upon any reliable basis. Accordingly, such "evidence" is inadmissible.

**12.** Claims under Title VII and the HRL are analyzed under the same legal standards. *Tomka*, 66 F.3d at 1312–13. Thus, the following analysis applies equally to the Title VII and HRL claims.

**13.** Plaintiff has not actually submitted all of the deposition pages found at pp. 108–120, but certain selected pages.

should earn the same amount of money as them.

I was notified by Sheriff Jock that certain male members of the department went to the Board of Legislators and complained that the [D/COs] should not earn the same amount of money as the road patrol/correction officers.

Pl.'s Ex. 1 at ¶¶ 6–7.[14]

Hurlburt further testified that the County conducted a survey of wages in surrounding counties and obtained wage figures for both dispatchers and for corrections officers. *Id.* at 113–118. Although Plaintiff complains that the study was flawed because surrounding counties did not have hybrid D/CO positions, the evidence in the record demonstrates that the County accounted for this fact. Hurlburt testified that the County picked a wage "somewhere in the middle [between the dispatch wage and the corrections officer wage] where it would be fair." *Id.* at 117.[15] Although the fact that there were no male D/COs and no female COs or road patrol officers could raise suspicions that there is some sort of discrimination going

on,[16] the fact of the matter is that Plaintiff has failed to submit sufficient evidence of discriminatory animus upon which a jury could return a verdict in her favor. *See Aldrich v. Randolph Central Sch. Dist.,* 963 F.2d 520, 528 (2d Cir.1992). The only conclusion that can be drawn from the evidence submitted by Plaintiff is that the wage was set out of concern for the respective contents of the job; not based on gender. Accordingly, the Title VII wage claim must be dismissed.

### 2. Hostile Work Environment

Plaintiff next contends that she was subjected to a hostile work environment. As the Second Circuit has explained,

In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. .... This test has objective and subjective elements: the misconduct must be severe or pervasive enough to

14. It should be noted that there were no female members of the road patrol. This information is significant with respect to the Title VII pay claim because it explains why "male members of the Sheriff's Department" complained—they were the only ones in road patrol. It is difficult to conceive why any female members of the LCSD would complain regarding a salary increase for the D/COs. There is no claim of discriminatory hiring with respect to the road patrol or the COs.

15. At deposition, Hurlburt was asked the following questions and gave the following answers:

A. ... [S]omewhere in the middle where it would be fair.
Q. Somewhere between the dispatcher position and correction officer position would be a fair comparison or dispatcher/correction officer?
A. Correct.
Q. Whose thought was that?

A. Us as a committee. We discussed that to try to be—to try to give them a fair wage without making it unfair to someone else as like road patrol.
Q. So the committee felt that you should compensate the dispatch/correction officers for their correctional duties?
A. Certainly.
Q. You looked for a way to compensate them for correctional duties without upsetting other members of the department?
A. If possible.... To start with, we actually; you know, had in our mind that they deserved Grade 21, but after having the meeting with them and road patrol, we felt that we really didn't know what we were talking about. We ought to canvas the area around us and find out what they were doing, because maybe they were right, maybe road patrol was right.

16. As previously noted, there is no claim of discriminatory hiring.

create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. Among the factors to consider when determining whether an environment is sufficiently hostile are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. In determining whether a hostile environment exists, we must look at the totality of the circumstances. As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

*Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir.2003) (internal citations, quotations and alterations omitted).

### a. LaDuc

 In support of her hostile work environment claim, Plaintiff contends that LaDuc constantly commented on her dress, saying things like "maybe tomorrow you should wear your dress a little bit shorter," "why can't we see your legs to-

day," or "why don't you wear something low cut." Pl.'s Dep. at 99. LaDuc also is alleged to have commented on the sizes and weights of the D/COs on several occasions and to have commented that the young dispatchers were "cute bitches" and older dispatchers were "ugly bitches." *Id.* at 104. Although Plaintiff does not recall the exact frequency with which such comments were made, there is evidence in the record from which a fair-minded trier of fact could reasonably conclude that the comments were pervasive. Plaintiff states that, although the comments did not initially offend her, "it kept happening and I can't tell you how many times he had commented before I felt that way." *Id.* at 24. In her affidavit, Plaintiff contends that she and the other D/COs were subjected to "malicious comments about [her] appearance; [and] condescending remarks about [her] and [her] office" on a daily basis. Pl. Aff. at ¶ 36.

The references to wearing shorter dresses, lower cut attire, and "bitches" clearly can be considered to be gender-based. The evidence suggests that, although Defendants' actions were not physically threatening, they can be considered offensive and humiliating. The issue here is not so much the "quality" of the claimed offensive conduct, but the quantity of it. If true, a reasonable person could find that such comments made on a nearly daily basis are offensive and could unreasonably interfere with Plaintiff's work performance. Thus, there is sufficient evidence to satisfy the objective test.

It also is clear that the subjective test is satisfied. Although Plaintiff was not offended initially, there became a point in time when her feelings changed and she began to feel that the comments were malicious. Pl. Dep at p. 24. This is supported by Plaintiff's complaints to the Sheriff. Jock Dep. at pp. 190–92. Thus,

there is sufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to a hostile work environment.

 LaDuc can be held personally liable under N.Y. Exec. Law § 296(6), which makes it an unlawful act to "aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article." N.Y. Exec. Law § 296(6). Under this section of the HRL, "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable." *Tomka,* 66 F.3d at 1317. Because there is sufficient evidence upon which a fair-minded trier of fact could reasonably conclude that LaDuc actually participated in the conduct giving rise to a hostile work environment, under New York law, he is subject to personal liability.

**b. Rumble**

Plaintiff also contends that the various comments and actions of Rumble contributed to her hostile work environment and that he should be held personally liable therefor. Rumble is alleged to have called one D/CO a "fat bitch," called another "Nurse Goodbody," made comments about the D/COs' weights, and accused Plaintiff of having an affair with Jock. Pl.'s Dep. at 104–105; Pl.'s Ex. 109 at p. 89. The Court need not decide whether Rumble's alleged comments, taken alone, are sufficient to create a hostile work environment.[17] This is because the Court already found that there are genuine issues of material fact concerning whether Plaintiff was subjected to a hostile work environment and Rumble is sued pursuant to § 296(6) for aiding and abetting the alleged discriminatory conduct. A fair-minded trier of fact could find

that Rumble participated in the creation of a hostile work environment by making the above-referenced comments. Accordingly, Rumble's motion for summary judgment on the HRL claim is denied.

**c. Roberts**

Roberts' alleged comments are even less offensive and apparently less pervasive than those of Rumble. Nonetheless, Roberts is alleged to have referred to Plaintiff's office as the "Barbie house" on a daily basis and to have commented that Jock was Plaintiff's "boy toy." A trier of fact could conclude that these comments were part of the overall conduct contributing to a hostile work environment. Accordingly, Roberts may be subject to liability under § 296(6).

**d. Doney, Farney and Hurlburt** [18]

 Plaintiff also seeks to hold Doney and Hurlburt, members of the County legislature, liable under § 296(6). Plaintiff has failed to point to any evidence from which it may reasonably be concluded that Doney or Hurlbut aided, abetted or otherwise participated in the creation of a hostile work environment. Absent any such evidence, the HRL claims against Doney and Hurlburt must be dismissed.

**e. Jock**

 Plaintiff seeks to hold Jock liable under N.Y. Exec. Law § 296(1) on the theory that Jock and the County were her "joint employers." The undisputed evidence in the record is that Plaintiff was an employee of the County. Jock SMF at ¶¶ 4–5. Plaintiff is part of the civil service system. *Id.* at ¶ 8. In fact, Plaintiff specif-

---

17. Taken alone, it is doubtful that Rumble's boorish, yet sporadic comments would be sufficient to constitute a hostile work environment. *See* Pl.'s Dep. at p. 106.

18. Plaintiff has withdrawn her claims against Defendant Farney. *See* Pl.'s Mem. of Law at 88, n. 5. Accordingly, all claims against Farney are dismissed.

ically admitted that "Plaintiff was employed at all times referenced by Lewis County, and not by Sheriff Jock." *Id.* at ¶ 5. Although Jock necessarily had some authority over Plaintiff as her supervisor, he was not her employer. Plaintiff will not be entitled to argue in her memorandum of law against those facts that she admitted in her statement of material facts. Plaintiff also fails to demonstrate that Jock participated in the creation of a hostile work environment. Having failed to demonstrate any basis for imposing liability against Jock under the HRL, that claim is dismissed.

### f. Individual Liability Under Title VII

█ It is well-settled that none of the individual Defendants may be held personally liable under Title VII. *See Clarke v. Flushing Manor Care Center,* 2003 WL 1338663, at \*2 (S.D.N.Y.2003) (and cases cited therein). Accordingly, any such claims are dismissed.

### g. Lewis County

█ The remaining question is whether Lewis County may be held liable for any hostile work environment. The County contends that the Sheriff's Department is a separate legal entity from the County and the County may not be held accountable for the Sheriff Department's actions absent legislation to the contrary. The Court rejects this argument for several reasons. First, New York State Constitution art. XIII § 13(a) was amended in 1989 to delete the provision providing that a "county shall never be made responsible for the acts of the sheriff." Second, the Second Circuit has repeatedly held counties to be held accountable for the actions of its sheriff that violate federal law. *See, e.g., Shain v. Ellison,* 273 F.3d 56, 66 (2d Cir.2001) (noting that the county is respon-

sible for the sheriff department's illegal strip-search policy), *cert. denied,* 537 U.S. 1083, 123 S.Ct. 672, 154 L.Ed.2d 582 (2002); *Jeffes v. Barnes,* 208 F.3d 49 (2d Cir.2000) (holding that a sheriff is a final policymaker of the county). Third, the sexual harassment is not purported to have been caused by the Sheriff himself, but by corrections officers employed by the County. Fourth, it is doubtful that state law can exempt Plaintiff's employer (the County) from liability imposed pursuant to a federal statute. *See* U.S. Const. art. VI, cl. 2.

█ Because the sexual harassment is claimed to have been perpetrated by Plaintiff's supervisor (LaDuc) and there is evidence supporting a finding that LaDuc was, in fact, Plaintiff's supervisor, the County is presumed to be liable therefor. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). An employer may escape liability by pleading and proving, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative provided by the employer or to avoid harm otherwise. *Id.* The County has made no such showing here. Thus, if it is demonstrated that LaDuc was, in fact, Plaintiffs' supervisor, the County is presumptively liable for any sexual harassment.

### d. RETALIATION CLAIMS

█ Plaintiff also has asserted retaliation claims pursuant to Title VII, the EPA and 42 U.S.C. § 1983. To establish a prima facie case of retaliation, Plaintiff must demonstrate: (1) that she engaged in protected activity/protected speech known to Defendants; (2) that she suffered an adverse employment action; and (3) that

there is a causal connection between the protected activity and the adverse employment action. *See Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir.2003) (First Amendment); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002) (Title VII). What constitutes protected activity differs under each of the statutes invoked by Plaintiff. Protected activity under Title VII is rather broad, while protected activity under the EPA only includes "filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor." *Lambert*, 10 F.3d at 55; *see also Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir.2003). To constitute protected activity under the First Amendment, the speech must be of public concern. *See Mandell*, 316 F.3d at 383 ("As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment.") (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

**1. Protected Activity**

 Here, Defendants have not argued that Plaintiff did not engage in protected activity. In any event, there is evidence that Plaintiff engaged in protected activity known to Defendants, including filing complaints with the New York State Division of Human Rights in March and July of 2001. These complaints could constitute protected activity under both Title VII and the EPA. Plaintiffs' other activities, however, such as her claimed public advocacy during 2000–2001 for pay equality and complaints to her supervisor do not constitute protected activity under the EPA. These were not formal complaints or proceedings as required under the EPA. *Lambert*, 10 F.3d at 55. These activities may, however, constitute protected activity under Title VII and/or the First Amendment. *Eldred v. Consolidated Freight-*

*ways Corp. of Delaware*, 898 F.Supp. 928, 940 (D.Mass.1995) ("Opposing the pay disparity, first with the terminal manager ... and then under the Equal Pay Act, is a protected activity within the meaning of Title VII."). Plaintiff's complaints to Jock about her pay as dispatch supervisor are not protected speech under the First Amendment. This is because her complaints in this regard were related solely to her own personnel issues (whether she was entitled to a supervisor's rate of pay), rather than matters of public concern. *Ezekwo v. NYC Health and Hosps. Corp.*, 940 F.2d 775, 780–81 (2d Cir.1991).

**2. Adverse Employment Action**

The County argues that Plaintiff did not suffer any adverse employment actions. As the Second Circuit has stated

A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation, citations and alterations omitted).

 Looking at the facts in the light most favorable to Plaintiff, a jury could reasonably conclude that she suffered an adverse employment action. In 1999, Jock provisionally appointed Plaintiff to the position of dispatch supervisor. At that

time, Plaintiff was viewed as a supervisor and took on supervisory functions. Pl.'s Aff. at ¶ 14. According to Plaintiff, as dispatch supervisor, she discontinued performing D/CO functions and, instead, took on other new, important duties. *Id.* at ¶ 15. Plaintiff no longer worked in the control room, but was transferred into an office. *Id.* She was no longer required to wear a uniform. Her compensation, however, did not change. In May 2001, the County approved the creation of the dispatch supervisor position. Although Plaintiff had been performing that function since 1999, she was not formally given the position and, thus, was ineligible for any increased wages or benefits. In November 2001, the County abolished the position of dispatch supervisor. Jock then took away Plaintiff's dispatch supervisor duties, she was returned to the control room, and she was required to resume performing as a D/CO. *Id.* at ¶ 45. A fair-minded trier of fact could conclude that the change in title and duties from performing supervisory functions as a dispatch supervisor to performing D/CO functions and being transferred back into the control room could constitute a materially adverse change in employment. *See, e.g., Signer v. Tuffey,* 66 Fed.Appx. 232, 235–36, 2003 WL 1240611 (2d Cir.2003); *de la Cruz v. New York City Human Resources Administration Dep't of Soc. Servs.,* 82 F.3d 16, 20 (2d Cir.1996); *Rodriguez v. Board of Educ.,* 620 F.2d 362, 366 (2d Cir.1980); *compare Galabya,* 202 F.3d at 641–42 (noting that evidence that a transfer was to an assignment that was materially less prestigious or materially less conducive to career advancement could constitute a finding of an adverse employment action).

A trier of fact also could conclude that the non-renewal of the ASA in May 2001 was an adverse employment action. It must be recalled that, at all relevant times, Plaintiff was a full-time employee of the LCSD. Upon the retirement of the chief civil deputy, Jock requested that Plaintiff fulfill some of the chief civil deputy's duties. Accordingly, Plaintiff worked under two hats—one has a dispatch supervisor and one as secretary to the chief. Plaintiff received additional compensation for her services as secretary to the sheriff. The union filed a grievance claiming that it was improper for the County to pay Plaintiff an additional $10,000 above her negotiated salary schedule without negotiating the increase with the union. Accordingly, Plaintiff and the County entered into an ASA for a set period of time. It is evident that the purpose of the ASA was to circumvent the salary negotiation requirements under the CBA; not to split Plaintiff's duties into those as an employee (dispatch supervisor duties) and those as an independent contractor (secretary to the sheriff duties). Thus, the County's claim that it was not Plaintiff's employer for purposes of the non-renewal of the administrative services agreement must be rejected.

The non-renewal of the ASA had the effect of eliminating Plaintiff's secretary to the sheriff duties and eliminating the additional compensation she received. Understandably, the ASA had a specified term and was not subject to renewal. However, as noted, the entire ASA was a rouse to circumvent certain requirements imposed by the CBA. If Plaintiff had continued to work as secretary to the sheriff and not under an ASA, the elimination of her secretary to the sheriff duties and the concomitant pay reduction certainly would constitute an adverse employment action. Here, the County should not be able to escape the same conclusion simply because it engaged in some fanciful paperwork to satisfy the union while having Plaintiff perform the same work. Defendants are free to argue at trial that this was not, in fact,

an adverse employment action. The Court is simply holding that a fair-minded trier of fact could find that it was.

Plaintiff also claims that the denial of sick leave bank time constituted an adverse employment action. Plaintiff participated in the County's voluntary sick leave bank. Under that program, an employee could donate certain amounts of sick leave to the sick leave bank. In the event of a prolonged illness, an employee who had exhausted accumulated leave time "may be entitled to draw up to a maximum of 60 days or 15% of the Sick Leave Bank ... in a given year." Pl.'s Ex. 62. The sick leave bank, although voluntary, provides a significant benefit for those who choose to participate in it. Moreover, to participate, an employee has to give up certain accrued sick leave time (3 days upon enrollment and 1 day each year thereafter). Under these circumstances, a fair-minded trier of fact could conclude that the refusal to allow an employee to reap the benefits of this program constitutes a materially adverse employment action.

### 3. Causal Connection

■ The County does not argue that there is no causal connection between the alleged protected activity and the alleged adverse employment actions. In any event, the temporal proximity between Plaintiff's March and June 2001 complaints to the EEOC and her continual complaints concerning pay and the May 2001 non-renewal of the Administrative Services Agreement, the August 2001 denial of Plaintiff's application to use sick bank leave time, the November 2001 abolishment of the dispatch supervisor position, and the November 2001 removal of Plaintiff's dispatch supervisor responsibilities is sufficient to support an inference of causation. *See Treglia*, 313 F.3d at 720–21.

For the foregoing reasons, Plaintiff has established a prima facie case of retalia-

tion. Because Defendants have not proffered any legitimate, non-retaliatory reasons for any alleged adverse employment actions, the Court need not wend its way through the remaining steps of the *McDonnell–Douglas* burden shifting methodology. Suffice it to say that there are sufficient triable issues of fact warranting a denial of the County's motion for summary judgment with respect to the retaliation claims.

### 4. Liability of Jock on Plaintiff's Claim Pursuant to 42 U.S.C. § 1983

In his statement of material facts, Jock states that he "did not knowingly retaliate against Plaintiff, and according to Plaintiff, the Sheriff's 'retaliation' against her consisted solely of not 'backing' her sufficiently." Jock SMF at ¶ 24. Plaintiff admitted to this statement. Based upon these admitted facts, it must be concluded as a matter of law that Jock did not engage in any retaliatory conduct. Plaintiff repeatedly admits that Jock was supportive of her efforts to obtain pay for work performed as secretary to the sheriff, supported the renewal of the administrative services agreement, supported Plaintiff's efforts to be promoted to the dispatch supervisor position, and sought a raise for Plaintiff as dispatch supervisor. Jock SMF at ¶¶ 14, 20, 22. Moreover, although it was Jock who transferred Plaintiff from the dispatch supervisor position to the D/CO position, he did so only because he was forced to do so when the County eliminated the position. *See* Jock SMF at ¶ 17 and Pl.'s response thereto. Thus, there is no evidence of any retaliatory conduct by Jock.

### e. Liability of Doney, Farney and Hurlburt

Doney and Hurlburt move to dismiss on the grounds that: (1) they were not acting

under color of state law; and (2) they are entitled to legislative immunity. Both of these claims must be rejected.

■ Doney and Hurlburt contend that they are being sued as private individuals and, thus, they were not acting under color of state law. An individual acts under color of state law when exercising power " 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Polk County v. Dodson*, 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)); *see also West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, Doney and Hurlburt's actions were taken by virtue of their positions with the County legislature. As such, their actions were under color of state law.

With respect to the issue of legislative immunity, the Second Circuit has stated that

Legislators are entitled to absolute immunity from civil liability for their legislative activities. This Circuit has previously held that absolute legislative immunity for Section 1983 actions extends to local legislators . . . .

The test for determining whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. Under this functional test, immunity depends on the nature of the act itself, not the identity of the actor performing it.

The first step in our inquiry is whether the Board members' actions were legislative in function. In order for legislative immunity to attach, the act in question must be taken in the sphere of legitimate legislative activity. Discretionary personnel decisions, even if undertaken by public officials who other-

wise are entitled to immunity, do not give rise to immunity because such decisionmaking is no different in substance from that which is enjoyed by other actors. In so holding, we do not mean to suggest that decisions regarding the elimination of a class of jobs for budgetary or policy reasons would not be legislative in nature simply because they relate to employment. To reiterate, it is the nature of the act that we examine to determine whether legislative immunity applies.

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210–11 (2d Cir.2003).

■■ Here, the decisions concerning the creation and subsequent abolition of the dispatch supervisor position were legislative functions. The record reveals that, although there were comments regarding Plaintiff's connection with these positions, the overall question was whether to authorize such a position. This falls within the legislative function. *Harhay*, 323 F.3d at 211. Doney and Hurlburt's acts concerning whether to permit Jock to provisionally fill the dispatch supervisor position, however, cannot be said to be legislative in function. *Id.* at 210. Whether to permit Jock to fill the position was a discretionary personnel decision outside the scope of legislative acts. The same holds true with respect to the decision not to renew Plaintiff's ASA. Accordingly, Doney and Hurlburt may be held liable to the extent it is found that their actions in refusing to permit Jock to provisionally appoint her to the dispatch supervisor position and/or in refusing to renew the ASA were in retaliation for Plaintiff's protected activity.

### f. Defamation Claim

Defendants Doney, Rumble and Roberts move to dismiss the defamation claim on

the ground that it is time-barred. These Defendants have submitted evidence that the alleged defamatory statements were made as early as June 2000. Rumble Ex. H. In her opposition papers, Plaintiff does not oppose the motion to dismiss the defamation claim. Significantly, Plaintiff has not pointed to any evidence from which it reasonably may be inferred: (1) that any of the alleged defamatory statements were made within the applicable statute of limitations;[19] or, more significantly, (2) that any of the Defendants actually made any defamatory statements. While such evidence may exist buried somewhere in the voluminous submissions to the Court, the burden of identifying such evidence for the Court in opposition to Defendants' motions lays with Plaintiff. The Local Rules require the litigant, not the Court, to sift through the record and bring to the Court's attention the pertinent information. *See Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 291 (2d Cir.2000) (Noting that the local rules are "designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested

facts..... While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (internal quotations and citations omitted). Because Plaintiff has failed to identify any evidence of defamatory statements made by these Defendants or any evidence that any such statements were made within the applicable statute of limitations, the defamation claims are dismissed.

### g. Plaintiff's Appeal of the Magistrate Judge's Order Denying Leave to File a Supplemental Second Amended Complaint

Plaintiff also appeals from the Magistrate Judge's January 30, 2004 Order denying her leave to file a supplemental second amended complaint asserting additional allegations of discrimination concerning an alleged denial of a promotional opportunity and to add an additional Defendant, the Lewis County Civil Service Commission. The Magistrate Judge denied the motion for leave to amend on the grounds that summary judgment motions were then pending, the case is slated for trial in June, the addition of new claims would requires additional discovery, and Defendants would be prejudiced by the amendment.

For the following reasons, the Court affirms the decision of the Magistrate

---

19. Under New York law, defamation claims are subject to a one year statute of limitations. N.Y.C.P.L.R. § 215. The evidence in the record is that any alleged defamatory statements were made beginning in June 2000. The initial Complaint was filed on June 26, 2001. The original Complaint named only Lewis County as a Defendant and asserted only claims under the EPA and for emotional distress. Plaintiff did not file an Amended Complaint naming Doney, Roberts and Rumble until June 2002. The defamation claims in the Amended Complaint do not arise out of the same conduct, transactions, or occurrences set forth or attempted to be set forth in the original pleading, Fed.R.Civ.P. 15(c)(2), and the failure to name Doney, Rumble or Roberts in the initial Complaint is not alleged to have been a mistake. *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 128 (2d Cir. 2001). Accordingly, the Amended Complaint does not relate back to the original Complaint.

Judge. First, discovery in this action has been complete for quite some time now. Second, Plaintiff has already filed three different complaints (an original· and two amendments). Third, the facts supporting the new claim were known by early September 4, 2003 at the latest.[20] Nonetheless, despite the fact that discovery was completed and the dispositive motion filing deadline was quickly approaching, Plaintiff waited until late November to raise the issue of another amended Complaint with Defendants and waited until mid-December 2003 to raise the issue with the Magistrate Judge. Plaintiff did not file a motion for leave to file an amended Complaint until December 29, 2003. Given the length of time this case had already been pending and the deadlines the parties were facing, the Court finds that Plaintiff waited too long in seeking to· amend her Complaint.

Fourth, although the facts giving rise to the new claims arose after the close of discovery, permitting new claims would require discovery to be reopened and will likely cause a significant delay in this litigation which is scheduled for trial in June. Although Plaintiff contends that no additional discovery would be required, the Court finds it difficult to agree with that proposition. Plaintiff is seeking to add an entirely new basis for liability—that the County and the County Civil Service Commission should be liable because they refused to allow her to sit for a particular promotional exam on account of her gender. The Court is cognizant that the operative pleading is rife with allegations of gender-based discrimination, but Plaintiff now references a discrete instance of alleged discrimination that could not have been addressed during the discovery period because it is alleged to have occurred after the close of discovery. Certainly, Defendants would be entitled to discovery on these new events and the circumstances surrounding these events. This may include obtaining documents from the Civil Service Commission, deposing members of the Commission and re-deposing Plaintiff and/or Jock.

Moreover, Plaintiff is seeking to add a new party—the Lewis County Civil Service Commission. There are questions concerning whether the proposed new party, the Lewis County Civil Service Commission, is an arm of the County or a separate legal entity. At first blush, it appears that the Commission may not be an arm of the County. *See Slavin v. McGuire*, 205 N.Y. 84, 87, 98 N.E. 405 (1912) ("Although the members of the municipal civil service commission are local officers, they act, not for the municipality, but for the public in carrying out the provisions of the State Civil Service Law. They are not the servants of the municipality."); *Allen v. City of New York*, 160 A.D. 534, 145 N.Y.S. 1022 (2d Dept.1914) (same). This issue alone is certain to cause legal battles that must be resolved by the Court. This is likely to lead to further delay. Moreover, if the Commission is found to be a separate legal entity, it would be entitled to time to retain counsel and to obtain discovery concerning the allegations against it, notwithstanding any discovery the other Defendants may have undertaken. Additionally, if the Lewis County Civil Service Commission is separate from the County, it would also have to

---

**20.** Although Plaintiff contends that she was in constant communication with the Civil Service Commission throughout September and October 2003 regarding its refusal to permit Plaintiff to sit for the exam, the fact remains that the Commission unequivocally denied Plaintiff's application to take the exam on September 4, 2003. Although Plaintiff may not have known all the facts surrounding the incident, she already felt the effects of it and had enough information to make a claim.

be afforded an opportunity to raise such issues as whether any HRL or Title VII claims against it were properly exhausted. This would present further legal issues that must be resolved by the Court before this matter could proceed to trial. Again, this is likely to cause significant delay.

Fifth, allowing the addition of a new Defendant and new claims would require additional delay to permit Defendants to file responsive pleadings and/or motions to dismiss and the opportunity to obtain summary judgment on the new claims.

For the foregoing reasons, the Court finds that the Magistrate Judge's Order denying Plaintiff's motion for leave to file a Supplemental, Second Amended Complaint is not clearly erroneous. 28 U.S.C. § 636(b)(1)(A).

## IV. CONCLUSION

For the foregoing reasons, the Court AFFIRMS the January 30, 2004 Order of the Magistrate Judge. Defendants' motions for summary judgment are GRANTED IN PART AND DENIED IN PART as follows:

1. The motion to exclude Plaintiff's expert is GRANTED IN PART. The expert will be permitted to testify to those limited issues identified *supra*;.

2. The EPA claims are DISMISSED with respect to the D/CO and CO positions. The County and Plaintiff are granted leave to file supplemental briefs (as detailed *supra*) with respect to the EPA claims concerning the secretary to the sheriff and dispatch supervisor positions;

3. The discriminatory wage setting claims under Title VII and the HRL are DISMISSED IN THEIR ENTIRETY;

4. The Title VII claims as to the individual defendants are DISMISSED IN THEIR ENTIRETY;

5. The motion to dismiss the Title VII hostile work environment claim against the County is DENIED;

6. The motions to dismiss any New York Human Rights Law claims are GRANTED IN THEIR ENTIRETY as to Defendants Jock, Doney, Farney and Hurlburt;

7. The motions to dismiss the New York Human Rights Law claims as to Defendants Lewis County, John LaDuc, Devere Rumble and Dale Roberts are DENIED;

8. Jock's motion to dismiss the claim pursuant to 42 U.S.C. § 1983 as against him is GRANTED;

9. Defendant Lewis County's motion to dismiss the retaliation claims pursuant to 42 U.S.C. § 1983, Title VII and the EPA is DENIED;

10. Defendants Doney and Hurlburt's motion to dismiss the retaliation claim pursuant to 42 U.S.C. § 1983 is DENIED;

11. The defamation claims against Doney, Rumble and Roberts are DISMISSED; and

12. All claims against Farney are DISMISSED WITHOUT PREJUDICE (all other claims previously identified are dismissed with prejudice).

IT IS SO ORDERED.