**Susan BELFI, Plaintiff–Appellant,**

v.

**Thomas F. PRENDERGAST, as President of the Lirr, Metropolitan Transportation Authority of the State of New York (MTA), E. Virgil Conway, as Chairman of MTA, Defendants,**

**Long Island Railroad, Defendant–Appellee.**

**Docket No. 98–9002**

United States Court of Appeals, Second Circuit.

Argued March 9, 1999

Decided Sept. 13, 1999

Mercedes M. Maldonado, New York, New York (Carl Rachlin, O'Donnell, Schwartz, Glanstein & Rosen, New York, New York, of counsel), for Plaintiff–Appellant.

Richard J. Berka, Jamaica, New York (Michael R. Ambrecht, Jamaica, New York, of counsel), for Defendant–Appellee.

Before: CARDAMONE, STRAUB, and KEITH[*], Circuit Judges.

CARDAMONE, Circuit Judge:

On this appeal we deal with an employer long on salary policies, but short on reasons justifying their application to plaintiff, a female employee whose salary for the same work was less than those of her male peers. Susan Belfi (plaintiff or appellant) appeals from a judgment entered March 26, 1998 in the United States District Court for the Southern District of New York (Ward, J.), granting defendant the Long Island Railroad's motion for summary judgment on Belfi's Equal Pay Act and Title VII claims and dismissing her complaint in its entirety. On appeal, Belfi contends that the district court failed to view the evidence in the light most favorable to her as the non-movant, and simply accepted the nondiscriminatory explanations proffered by the Long Island Railroad for the salary disparity between her and male employees holding the same position.

[*] Hon. Damon J. Keith, U.S. Circuit Judge, U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## BACKGROUND

Plaintiff was hired originally by the Long Island Railroad (LIRR, railroad, or defendant) in 1973 as a stenotypist and held that position for 15 years. In 1989 she became a payroll clerk, earning $34,-000 per year under the terms of the collective bargaining agreement between her union and the LIRR. Subsequently, she was promoted to the position of Office Engineer–Communications on a temporary basis, at which time her salary was increased to $39,508, the minimum salary for that position. On January 1, 1990 the minimum salary for the Office Engineer position was increased by a little over $1,000, to $40,691. But Belfi did not then receive an increase in her salary.

On July 16, 1990 plaintiff received a permanent appointment to her current position of Office Engineer–Signal in the Signal Department. Her starting salary at the permanent position remained the minimum, $40,691 per year while the salaries of her two male peers—Office Engineer–Communications and Office Engineer–Electric Traction—were $52,794 and $53,-046 respectively.

### A. Salary Scheme

The LIRR employs three individuals who hold the title of office engineer, one each for the Signal Department, the Communications Department, and the Electric Traction Department. The position of office engineer is clerical in nature and is represented by the National Transportation Supervisors' Association (NTSA). Although the position is union-represented, in 1986 the NTSA entered into an agreement with the LIRR that placed NTSA members under the Salary Administration Plan (Salary Plan) applicable to LIRR managerial employees. Thus, wage adjustments after 1986 were determined by the railroad under an annual evaluation

plan rather than under the collective bargaining agreement with the NTSA.

Under the Salary Plan, a position is evaluated using the "Hay Method" to determine salary: A Hay point value is assigned depending on the skills and talents needed to perform the job, and a minimum, midpoint, and maximum salary range for the position is established. All three office engineer positions are assigned the same number of Hay points and have the same minimum, midpoint, and maximum salaries. The Salary Plan specifies that a newly ·promoted employee should be paid the minimum salary for the position. If the employee's former salary was already within the range of the new position, the railroad would give that employee a salary increase either up to 10 percent of the current salary or up to 112 percent of the midpoint salary, whichever is less.

Dan Hughes, Gerald Fishman, and Ray Rinfret held the three office engineer positions when those positions underwent the 1986 salary restructuring to the Hay method. Rinfret had been an office engineer for six years; Fishman had been one for four years and four months; and Hughes had held the title for one year and eight months. Upon the transition to the Salary Plan, all were paid the same annual salary of $46,936.

When Belfi received a temporary promotion in November, 1989 at a salary of $39,508, Hughes was earning $52,794 and Fishman was earning $53,046. One year later, Belfi's salary was $43,132; Hughes' was $55,038, and Fishman's was $55,168. In 1991 and 1992 none of the three received an increase in salary, although 85 employees under the Salary Plan received promotional increases between 1991 and 1992, 35 of which were based on either inequity increases or compression increases. In 1993 the LIRR Salary Plan provided a 4 percent merit increase for all employees covered by the plan, rather than individual assessments of merit. Hence, Belfi's salary was increased to $44,857, and Hughes' was increased to $57,240. Fishman was not included because of his anticipated retirement.

On June 15, 1994 the railroad hired Gary Barnett as the Office Engineer–Electric Traction to replace Fishman, who had retired. Barnett was hired at a salary of $51,249, $6,000 more than Belfi's salary and $8,931 more than the minimum for the position. Barnett had been an acting office engineer since November 15, 1993, although he formally held the title of third railman, a position represented by the International Brotherhood of Electrical Workers.

### B. *Procedural History*

In October 1992 Belfi first became aware that the salaries of the· two male office engineers at that time, Fishman and Hughes, were substantially higher than her salary. Plaintiff later also discovered a substantial disparity between her salary and that of Gary Barnett, the office engineer hired to replace Fishman. Throughout this period, she communicated with her union representative, who filed grievances on her behalf.

In response to plaintiff's 1992 grievance, the supervisor of the office engineers explained that the "time spent in the position by each of the incumbents" was the reason for the disparity in salary between the office engineers. When the NSTA again brought the disparity to the attention of the LIRR, Rein Olvet, the Director of Labor Relations, explained that the 1986 transition of the office engineer positions to the Salary Plan, which resulted in Hughes, Fishman and Rinfret all receiving the same salary of $46,936, caused the disparity. Olvet concluded that because the disparity was attributable to the 1986 transition salary increase, an increase for Belfi was not warranted. The LIRR never attempted to equalize plaintiff's salary with that of Fishman and Hughes.

Before selecting Barnett for the position of Office Engineer–Electric Traction, the

railroad interviewed nine people. Defendant asserts that it was necessary to pay Barnett $51,249 to induce him to accept the position. An administrator described defendant's policy as follows: "In order to attract union employees to management, LIRR has found it necessary to consider W–2 earnings, which include overtime, in applying the ten percent (10%) promotional increase in accordance with its policy."

Four months after Barnett's promotion, Steve LaRocco, the supervisor of the office engineers at that time, sent a memorandum to Tom Waring, the Vice President for Customer Services, stating that Barnett had been promoted to a rate higher than Belfi's salary. LaRocco requested authorization to adjust Belfi's salary to $54,200, which would have equitably positioned her salary between Hughes' salary of $57,240 and Barnett's of $51,249. The LIRR refused this request declaring that it was not in accordance with the LIRR salary policy relating to inequity increases. However, because of the disparity, the LIRR eventually consented to bring Belfi's salary up to Barnett's, stating that such an increase was allowed by the inequity increase policy. This increase became effective in November or December, 1995 and was made retroactive to January 1, 1995. Yet, Belfi's salary for the period from June 15, 1994 to January 1, 1995 was significantly less than Barnett's.

As a result of the salary disparity, Belfi filed a discrimination charge with the Equal Employment Opportunity Commission on April 12, 1995. The Civil Rights Division did not file suit on Belfi's behalf, but by letter notified her that she had the right to sue the LIRR within a specified time. On March 1, 1996 Belfi timely filed suit in the Southern District of New York against the LIRR, Thomas Prendergast as president of the LIRR, the Metropolitan Transportation Authority of the State of New York (MTA), and E. Virgil Conway as chairman of the MTA. The disparity between plaintiff's salary and those of Fishman, Hughes, and Barnett formed the basis of her claims under the Equal Pay Act of 1963, a part of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (EPA), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Fourteenth Amendment to the United States Constitution, and state law. According to plaintiff, she was underpaid from 1989 to 1996, when she received an inequity increase that raised her salary to $51,249. The inequity increase, as noted, was made retroactive to January 1, 1995.

By stipulation between the parties dated June 27, 1996, plaintiff's action was discontinued against defendants Thomas Prendergast, the MTA, and E. Virgil Conway. The LIRR then moved for summary judgment on the grounds that: (1) there was no sex discrimination against Belfi; (2) her Title VII claim was improperly pled and time-barred; and (3) her state law claim was time-barred. The LIRR asserted that plaintiff's salary was not the result of gender-based discrimination, but rather of the LIRR's established Salary Plan and its policy of inducing union workers to join management. Plaintiff responded that the affirmative defenses offered by the LIRR were pretexts for gender-based discrimination.

The district court found plaintiff had established a *prima facie* case under the EPA, but had failed to rebut the LIRR's non-discriminatory reasons for the discrepancy between her salary and those of her male counterparts. The district court thereupon granted summary judgment on the EPA claim in favor of the LIRR. The trial court also granted summary judgment in favor of the LIRR with respect to the Title VII claim, finding that by failing to show discriminatory animus plaintiff had not made out a *prima facie* case. The trial court held Belfi's failure to prove discrimination by the LIRR also mandated the dismissal of her Fourteenth Amendment claim. Additionally, it dismissed her state law claim, ruling that she had failed to articulate a cognizable claim under state law. This appeal followed.

## DISCUSSION

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, in ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We have emphasized that the trial court must be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). We review *de novo* the district court's grant of summary judgment, applying the same standards the trial court did.

■ Appellant's challenge to her employer's conduct, which she alleges discriminated against her, is limited on this appeal to her claims under the Equal Pay Act and Title VII. One of the main substantive differences between these two laws, which both provide remedies to victims of proven acts of sex discrimination, is that the former provides strict liability while the later requires proof of discriminatory intent. After a plaintiff has made out a *prima facie* case under Title VII, the familiar burden of going forward shifts, as set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to the employer to "articulate some legitimate, nondiscriminatory reason for the [negative decision affecting an employee]." *Id.* at 802, 93 S.Ct. 1817. The plaintiff shoulders the ultimate burden of proving that the employer's articulated reason was pretextual. *See Furnco Const. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

■ The purpose behind the enactment of the EPA was to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work. The EPA required employers to pay equal wages for equal work. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Under the Equal Pay Act once a plaintiff makes out a *prima facie* case, she need not prove a discriminatory animus on her employer's part. Instead, the statute affords the employer four affirmative defenses and the burden of persuasion shifts to the employer to prove the disparity is justified by one of these defenses. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

## I Equal Pay Act

### A. *General Standards*

■ The Equal Pay Act, passed by Congress in 1963, prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). To prove a violation of the EPA, a plaintiff must first establish a *prima facie* case of discrimination by showing: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Tomka,* 66 F.3d at 1310; *accord Corning Glass Works,* 417 U.S. at 195, 94 S.Ct. 2223.

 Under the EPA, proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim. *See Pollis v. New School for Social Research*, 132 F.3d 115, 118 (2d Cir.1997); *Strecker v. Grand Forks County Soc. Serv. Bd.*, 640 F.2d 96, 99 n. 1 (8th Cir.1980) ("The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown."), *adopted en banc*, 640 F.2d 96, 109 (8th Cir.1981). Thus, a *prima facie* showing gives rise to a presumption of discrimination.

 Once a plaintiff makes out a *prima facie* case under the EPA, the burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Further, to successfully establish the "factor other than sex" defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential. *See Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526–27 & n. 1 (2d Cir.1992); *EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir.1988) ("[T]he 'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.").

 Following such proof by the employer, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination. *See Aldrich*, 963 F.2d at 526. " 'The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices.' " *Id.* (quoting *Maxwell v.*

*City of Tucson*, 803 F.2d 444, 446 (9th Cir.1986)).

## B. *Application*

 We agree with the district court that Belfi established a *prima facie* case under the EPA. Belfi, Fishman, Hughes, and Barnett all were employed as office engineers. Each of these positions required equal skill, equal effort, and equal responsibility. All three performed their duties in similar working environments. The LIRR concedes that Belfi's salary was less than that of her male peers. Accordingly, the railroad may escape liability only by showing that the salary discrepancy was justified by an affirmative defense.

The railroad asserts that a combination of two affirmative defenses, seniority and factors other than sex, justifies the differential between the salaries of Belfi and her male counterparts. With respect to Hughes and Fishman, the LIRR relies on both defenses, and as to Barnett, the railroad relies only upon factors other than sex.

1. *Seniority.* Fishman, who is now retired, held the position of Office Engineer–Electric Traction from May 26, 1982 until his retirement; Hughes, currently the Office Engineer–Communications, has held that position since February 6, 1985, nearly 15 years. Belfi temporarily served as the Office Engineer–Communications for the eight month period from November 16, 1989 to July 16, 1990, when she was appointed to a permanent position as Office Engineer–Signal. Hence, Fishman had been and Hughes continues to be in their respective positions for a significantly longer period than Belfi.

2. *Factors other than sex.* The LIRR also maintains that a factor other than sex, namely, its gender-neutral application of the Salary Plan, resulted in the wage differential. Defendant first explains that plaintiff has been treated fairly under the Salary Plan. She was given a raise of at least 10 percent upon her temporary appointment as an office engineer, given a 3

percent increase to meet the new minimum salary of an office engineer upon her permanent appointment in the Signal Department, and given a 6 percent merit increase in the fall of 1990 upon the one year anniversary of her temporary appointment. In 1990, the other two office engineers received merit increases of 4 percent and 4.25 percent.

The LIRR next points out that due to financial constraints in 1991 and 1992 no merit increases were awarded to employees under the Salary Plan. In 1993 the employer awarded a uniform 4 percent merit increase, received by both Hughes and Belfi. Under the 1994 plan that allowed for maximum merit increases of 6 percent, Belfi received an increase of 4.5 percent and Hughes received one of 3 percent. The railroad contends that over time, if the Plan received adequate funding from New York State, plaintiff would have consistently received greater increases than Hughes, so that her salary would eventually have approached his.

In June 1994 the LIRR hired Barnett to replace the retiring Fishman as Office Engineer–Electric Traction. As noted, Barnett's starting salary as an office engineer was $51,249, $6,000 more than Belfi's salary at that time. The railroad's explanation for Barnett's higher salary is that in the 1990s it was more attractive for LIRR employees to be union workers than to be in NTSA positions governed by the Salary Plan because the unions received overtime pay and merit increases during the period of the Salary Plan wage freeze. The LIRR therefore attempted to attract union employees to management by including overtime pay in calculating the 10 percent promotion increase given under the Salary Plan. Such calculation, according to the railroad, resulted in Barnett's higher salary.

The district court ruled, and we agree, that the LIRR proffered the above gender-neutral explanations in response to Belfi's claim of unequal pay. As a result, the burden of persuasion shifted back to Belfi to show that the LIRR's explanations were a pretext for gender-based discrimination. In granting summary judgment to defendant the district court obviously concluded plaintiff had not shown pretext. It is at this juncture that we part company from the trial court.

3. *Pretext.* As evidence of pretext, appellant maintains that under the Salary Plan, she should have been awarded an inequity increase earlier to bring her salary closer to that of the other office engineers. The Plan allows for an inequity increase in two circumstances: (1) where the employee's salary is low in comparison with peers as a result of restructuring, reorganization, or job consolidation; or (2) where the promotion of a represented employee to a management position may have resulted in her earning a salary greater than that of a seasoned incumbent. Belfi contends that her salary, in light of the 1986 transition of the office engineer positions to the Hay method, satisfied the first circumstance in which an inequity increase could be granted.

But, the trial court disregarded appellant's assertions regarding her alleged entitlement to an inequity increase before 1995 and, in so doing, incorrectly resolved questions of fact. It placed weight on the fact that the transition to the Hay method preceded Belfi's promotion to office engineer by four years. Yet, nothing in the inequity increase policy suggests that the *timing* of the salary restructuring is relevant in deciding whether an employee could receive an inequity increase on this basis. In fact, when plaintiff's union filed a grievance on her behalf, on at least one occasion the salary disparity was explained as resulting directly from the 1986 transition to the Hay method. Hence, defendant's explanation itself raises a question of fact regarding whether plaintiff qualified for an inequity increase.

Other evidence presented by plaintiff convinces us that there exist genuine issues of material fact regarding pre-

text sufficient to preclude a grant of summary judgment. Although it appears there are a number of such disputed issues, we will focus on three. First, when the minimum salary for the temporary position plaintiff held—Office Engineer-Communications—was increased on January 1, 1990, Belfi was not paid this new minimum salary. The reason given by the railroad was its salary policy that requires an employee to have been in the position, whether temporary or permanent, for one year in order to be entitled to the minimum salary. A trier of fact might find this reason pretextual by examining first the railroad's rule that an employee hired or promoted to a given position should normally be paid the position's minimum salary. And, a factfinder might consider further that on July 16, 1990 appellant's salary was brought up to the minimum. This date was four months short of meeting the "one-year in position" rule that the LIRR had originally proffered as its reason for plaintiff's salary discrepancy. Such gap creates a question of fact with regard to the railroad's action under its one-year policy, that is, whether it was legitimate or a pretext for gender discrimination.

Second, between June 1994 and January 1995 plaintiff's salary was $6,000 less than that of Gary Barnett, who was brought in as a new hire to the position Office Engineer–Electric Traction to replace Fishman, who had retired. We agree with the trial court's characterization of this pay disparity as "unfortunate," but we think such disparity may also constitute proof of pretext when the basis for the employer's decision is analyzed. Barnett, the railroad explained, was given this higher salary as a promotional increase to induce represented employees to join the ranks of management. Before Barnett came, when Belfi complained that her salary was less than her two male counterparts, Fishman and Hughes, the railroad advised her their salaries were greater because they were senior to her and had held their positions for an appreciable period of time. In the case of Barnett, seniority was, of course, not mentioned. Instead, the reason advanced was promotional increase.

An affidavit submitted by the railroad explained that whether such promotional increases for union workers were needed depended on who applied for a job, applicant flow, and other factors. Yet, nowhere in the record is there any evidence showing the application of these factors in determining whether the increase was required for Barnett's position. In fact, we find proof in the record such as the following statement: "[i]nequit[y increases] are not always ... straightforward." Such statement provides circumstantial evidence that some discretion exists regarding these positions, leaving open the possibility that a jury could believe Barnett was paid more by the railroad because he was male.

Beyond all this, the LIRR apparently recognized the inequity since the railroad thereafter increased Belfi's salary to equalize Barnett's on January 1, 1995. Yet this increase occurred seven months after Barnett came into the same position as plaintiff's, and Belfi was not made whole retroactively to June 15, 1994, the date of Barnett's appointment. This six and a half months of unequal pay then became a permanent disparity. We believe a trier of fact could find the employer's disparity in pay between Barnett and plaintiff for nearly seven months to be more than simply unfortunate and to be instead evidence of discrimination based on sex.

Third, the seniority rule, used by the railroad to explain why Belfi's salary was so much less than those of her colleagues Fishman and Hughes may not in this case have been a legitimate explanation, for two reasons. First, in 1986 Hughes, a male with only one year and eight months of experience as an Office Engineer, was given a 40 percent increase to equalize his salary with that of Fishman, a male with four years and four months of experience, and Rinfret, a male who had held the position for six years. Plainly, the seniori-

ty rule was not a bar to equal pay for male employees doing the same work. Second, when Barnett, a male, came on the job Belfi's four years of seniority apparently did not count, since Barnett's pay leapfrogged over plaintiff's.

Circumstantial evidence in the form of differing and inconsistent explanations from the railroad raise questions of fact to rebut its alleged non-discriminatory reasons for the wage disparity, and may provide the jury with a basis to find pretext. *See EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994) (inconsistent explanations provide evidentiary basis for jury to find discrimination).

Here, the LIRR had a different justification at every turn for why Belfi's salary was less than those of males doing the same work. The railroad shifted explanations to such an extent that its actions must have appeared to plaintiff like a thimblerig. The explanations for denying her equality of pay ranged from lack of seniority, to did not meet guidelines for an inequity increase, caused by the transition to the Salary Plan with its Hay point evaluation, and, finally, to the railroad's need to attract union workers to management. So that no matter which thimble plaintiff pointed to as encompassing the reason for her pay discrepancy, it could not be found there. Examining these shifts in justification, a jury could reasonably infer discrimination from the selective enforcement of the employer's policies. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997).

■ As stated earlier, where there is a discrepancy in wages and the employer offers its established policy as an explanation, inquiry must focus on whether that policy has been used reasonably in the case at hand, in light of the employer's stated purpose for the policy and in light of the employer's other practices. *See Aldrich*, 963 F.2d at 526. Because Belfi raises genuine issues of material fact regarding the reasonableness of the LIRR's use of their policies in her case, we think a

trier of fact could rationally find that gender-based discrimination was one of the motivating factors for the disparity or that the LIRR applied its policies unreasonably. Summary judgment in either circumstance is inappropriate.

## II Title VII Claim

■ We pass now to appellant's Title VII claim. Belfi also alleges discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. In evaluating such claims, we apply the burden shifting analysis of *McDonnell Douglas Corp.*, 411 U.S. at 802–04, 93 S.Ct. 1817, and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to make out a *prima facie* case of unequal pay for equal work under Title VII, a plaintiff must show that (1) she is a member of a protected class; and (2) she was paid less than non-members of her class for work requiring substantially the same responsibility. *See Tomka*, 66 F.3d at 1312 ("A claim of unequal pay for equal work under Title VII . . . is generally analyzed under the same standards used in an EPA claim."). In addition to the requirements that are generally the same as those under the EPA, "a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination." *Id.* at 1313.

On appeal Belfi urges that she made out a *prima facie* case under Title VII. The district court based its contrary conclusion on finding that plaintiff did not produce any evidence to show that the LIRR acted with discriminatory intent. Rather, it characterized Belfi as relying simply on the fact that her counterparts were paid more than she was and are men.

■ We recognize that the burden an employment discrimination plaintiff carries to survive a summary judgment motion at the *prima facie* stage is minimal. *Fisher v. Vassar College*, 114 F.3d 1332,

1340 n. 7 (2d Cir.1997) (*en banc*), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Plaintiff need only show that (1) she was a member of a protected class, (2) she was qualified for the job in question, (3) she was paid less than men for the same work, and (4) the employer's adverse employment decision occurred under circumstances that raise an inference of discrimination. The first three requirements—Belfi is a woman, qualified to be an Office Engineer–Signal in defendant's shop, and paid less than her male counterparts are conceded.

 It is on the fourth factor that plaintiff's Title VII case founders. On this factor of intent to discriminate, which requirement distinguishes this claim from plaintiff's EPA claim, plaintiff at all times bears the ultimate burden of proof. When plaintiff proves that the explanations offered by her employer for wage disparity are false, such does not automatically mean that plaintiff has carried her burden of persuasion on the factor of intent. Something is still needed when the employer's reasons for its actions are shown to be pretextual, that is to say, it must also be shown that not only was the reason offered false, but that the real reason was discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d at 1339.

Here the district court thought plaintiff relied in her Title VII proof on the fact that her counterparts were paid more than she was and were men. But, Belfi in fact additionally relies on the inconsistency and pretextual nature of the railroad's explanation for the wage disparity. But inconsistent and pretextual explanations do not constitute proof that the LIRR intended to discriminate against plaintiff because she was a woman. Absent that proof, a jury could not simply infer a discriminatory intent. As a consequence, the dismissal of plaintiff's Title VII claim must be affirmed.

## CONCLUSION

For the foregoing reasons, the grant of summary judgment in favor of the LIRR is affirmed with respect to plaintiff's Title VII claim; the grant of summary judgment with respect to plaintiff's EPA claim is reversed and remanded to the district court for further proceedings on the merits of that claim.