**Barbara KEARNEY, Plaintiff,**

v.

**ABN AMRO, INC, Defendant.**

**No. 04 CV 6885 (DAB).**

United States District Court, S.D. New York.

Sept. 15, 2010.

**422**

Andrew Steven Baron, Wollmuth Maher & Deutsch LLP, New York, NY, Cindy Debra Salvo, The Salvo Law Firm, P.C., for Plaintiff.

Lyle Stewart Zuckerman, Vedder Price P.C., New York, NY, for Defendant.

### MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

Plaintiff Barbara Kearney ("Kearney" or "Plaintiff") brings this action against Defendant ABN AMRO Inc. ("ABN AMRO" or "Defendant") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 290; the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107; and the New York Labor Law, Art. 6 §§ 194, 198. Defendant now moves for summary judgment against each of Plaintiff's claims. For the following reasons, Defendant's Motion is GRANTED.

### I. BACKGROUND

Plaintiff Kearney is a resident of the State of New York. (Amend. Compl., ¶ 8.) Defendant ABN AMRO is a New York Corporation with its principal place of business in the State of New York. (Amend. Compl., ¶ 9.)

ABN AMRO initially hired Plaintiff in October of 1990 as a secretary in the international financial management department, (Zucker Decl., Ex. E), but in 1992 Kearney became a product specialist with duties including those related to the payment of invoices, (Pl's. Rule 56.1 Stmt., ¶ 2.) In 1993, Plaintiff assumed certain compliance duties in ABN AMRO's international equity business and began to manage New York Human Resources and Office Administration. (Pl's. Rule 56.1 Stmt., ¶¶ 3-4.)

In 1996, ABN AMRO promoted Kearney to Vice President. (Pl's. Rule 56.1 Stmt., ¶ 5.) That same year, ABN AMRO purchased Chicago Corporation and determined that the newly acquired company's compliance group would oversee ABN AMRO's U.S. Compliance. (Pl's. Rule 56.1 Stmt., ¶ 7.) Around that time, Kearney voluntarily transitioned out of compliance and into ABN AMRO's equity markets group ("ECM"), which was divided into two subgroups: originations, which targeted and "pitched" companies and government entities to engage ABN AMRO for the raising of equity capital through financial transactions; and syndicate, which then executed those transactions. (Pl's. Rule 56.1 Stmt., ¶¶ 8, 10-12.) In March of 1997 Henry Erbe joined ABN AMRO, and in 1998 became co-head of ECM with Richard Heald and Charles van Schelle. (Pl's. Rule 56.1 Stmt., ¶¶ 13-14.)

The ECM group contained four investment bankers, Alexander Dake, Rolando Springall, Esteban Skare, and Vijay Karwal (collectively "investment bank comparators"), whom Plaintiff claims she was similarly situated to during the period of February of 1998 to Spring of 1999 for purposes of her pay discrimination claim. (Pl's. Rule 56.1 Stmt., ¶ 15; Pl's Mem. of Law, 4-5, 16.) While working for ECM, Plaintiff managed event planning duties, such as arranging client transportation, booking conference rooms, and purchasing client gifts, and played a role in administrating certain computer systems. (Pl's.

Rule 56.1 Stmt., ¶¶ 23–24.) Plaintiff also prepared "pitch books" for potential client meetings, and attended one or two client "pitch" meetings, but never played a lead role in any client "pitch" meeting. (Pl's. Rule 56.1 Stmt., ¶¶ 16–18, 20–21.)

The parties disagree, however, as to whether Plaintiff engaged in any of the economic or market condition analysis that was reflected in the pitch books and whether Plaintiff closed any deals or had overall, lead responsibility for any transaction. (Pl's. Rule 56.1 Stmt., ¶¶ 17, 19; Def's. Rule 56.1 Stmt., ¶¶ 17, 19.) The parties also disagree as to the precise employment characteristics of the four investment bank comparators, including whether Dake had overall responsibility for closing multiple equity deals, (Pl's. Rule 56.1 Stmt., ¶¶ 27–28), and whether Springall's duties included leading pitches, doing valuation work, performing due diligence, and leading a team to make the client pitch presentations," (Pl's. Rule 56.1 Stmt., ¶¶ 31–32.)

Plaintiff concedes, however that Springall traveled to client pitch meetings, (Pl's. Rule 56.1 Stmt., ¶ 30), that Skare joined the originations group in January 1999, had a six-year economics degree from the University of Buenos Aires, "could have attended more than ten client pitches," and "possibly had lead responsibility for at least one deal," (Pl's. Rule 56.1 Stmt., ¶¶ 33–36.) Plaintiff also concedes that "it could be possible that Karwal had overall, lead responsibility for deals in 1999" and that evidence in the record shows that Karwal's duties included "preparing financial analysis, working with credit bankers, doing valuation work, targeting institutional investors, working with analysts and associates to put written presentations together, ... go[ing] to the company that was the target for the presentation ... and driv[ing] and lead[ing] the process of pitching that business to the issuer." (Pl's. Rule 56.1 Stmt., ¶¶ 39–40.)

In or around 1997 or 1998, ABN AMRO and Rothschild, Inc. created a joint venture called ABN AMRO/Rothschild ("AAR"), and in the Spring of 1999, co-head of ECM Richard Heald asked Plaintiff to help with the process of submitting an application to the National Association of Securities Dealers ("NASD") to make AAR a registered broker-dealer, (Pl's. Rule 56.1 Stmt., ¶¶ 41–42.) Plaintiff spent the majority of her time working on that application and it was completed and granted in the Spring of 2000. (Pl's. Rule 56.1 Stmt., ¶¶ 43–45.) Following AAR's registration as a broker-dealer, all ECM employees became part of AAR. (Pl's. Rule 56.1 Stmt., ¶ 45.) Also at the time of AAR's registration with the NASD in the Spring of 2000, Plaintiff became Director of Financial Operations, and Chief Compliance Officer. (Pl's. Rule 56.1 Stmt., ¶ 46; Moses Decl., ¶ 13.) Plaintiff also acted as Chief Administrative Officer. (Pl's. Rule 56.1 Stmt., ¶ 48.)

Plaintiff's duties as Director of Financial Operations took one hour per month. (Pl's. Rule 56.1 Stmt., ¶ 47.) Further, from the Spring of 2000 through April of 2001, Plaintiff spent 70–75% of her time performing compliance-related duties and 20–25% of her time performing administrative and human resource duties. (Pl's. Rule 56.1 Stmt., ¶ 51.) In her role as Chief Administrative Officer, Plaintiff acted as AAR's Human Resources manager, "made sure the overall function of the office ... ran well" and was responsible for day-to-day coordination between ABN AMRO and Rothschild with respect to finance, accounting, information technology, and tax. (Pl's. Rule 56.1 Stmt., ¶¶ 57–58.)

From 1999 to the end of 2001 AAR had roughly 25–28 employees, including approximately 20 Registered Representa-

tives over whom Plaintiff had compliance responsibility. (Pl's. Rule 56.1 Stmt., ¶¶ 49–50.) In her role as Chief of Compliance, Plaintiff was responsible for implementing and managing firewalls and watch/restricted lists, monitoring employee trading accounts, ensuring that employees were registered, monitoring research as it relates to new equity issues, and conducting compliance training seminars. (Pl's. Rule 56.1 Stmt., ¶ 52.) In her role as Chief Compliance Officer, Plaintiff also completed or advised in the completion of numerous other compliance objectives and tasks, (van Schelle Decl., ¶ 12, Ex. B), although the parties contest whether or not Plaintiff was involved in "substantive compliance functions for AAR" such as "interpreting and providing advice concerning law and regulations interfacing with agency regulators on substantive matters." (Pl's. Rule 56.1 Stmt., ¶¶ 52–54; Def's. Rule 56.1 Stmt., ¶¶ 52–54.)

Plaintiff contends, and Defendant denies, that during her time with AAR from the Spring of 2000 to April of 2001, there were two other compliance officers, Robert Mulligan and Paul Loomis, with whom she was similarly situated for purposes of her pay discrimination claim. (Pl's. Rule 56.1 Stmt., ¶ 60; Def's. Rule 56.1 Stmt., ¶ 60.)

Robert Mulligan was head of ABN AMRO's compliance in New York, and had compliance responsibility for over 100 employees in sales and trading and 10 to 12 employees in research (Pl's. Rule 56.1 Stmt., ¶¶ 61–62.) Mulligan's duties included interpreting and providing advice concerning laws and regulations, interfacing with agency regulators, and acting as point-person for AAR's complicated compliance matters. (Pl's. Rule 56.1 Stmt., ¶¶ 63–64.)

Paul Loomis was hired by ABN AMRO in April of 2001 and had responsibility for compliance at AAR after Plaintiff was terminated. (Pl's. Rule 56.1 Stmt., ¶¶ 65–66.)

However, the parties contest whether Loomis was responsible for compliance within ABN AMRO's Fixed Income Group. (Pl's. Rule 56.1 Stmt., ¶ 66; Def's. Rule 56.1 Stmt., ¶ 66.)

In March of 2000, Erbe, van Schelle, and Rick Durkes, ABN AMRO's then Chief Executive Officer, promoted Kearney and Skare to Senior Vice President and increased their salaries to $125,000.00 and $160,000.00, respectively. (Pl's. Rule 56.1 Stmt., ¶¶ 73–74.) The parties agree that Plaintiff had conversations with Erbe and Schelle about her salary, but Plaintiff denies "that she never expressly stated, or even intimated, that she believed her sex was the reason her salary was too low." (Pl's. Rule 56.1 Stmt., ¶ 77.) Plaintiff concedes, however, that she did not complain about her compensation to Human Resources. (Pl's. Rule 56.1 Stmt., ¶ 78.) By late 2000 Carolyn Moses had become the new Chief Executive Officer of ABN AMRO, to whom Erbe directly reported. (Pl's. Rule 56.1 Stmt., ¶¶ 781–82.)

On January 30, 2001, ABN AMRO announced that it was purchasing ING Baring's prime brokerage unit, and issued a press release stating that a "reduction in personnel [would] be implemented to ensure that maximum value is created for ABN AMRO and the bank's strategic objectives are realized." (Pl's Rule 56.1 Stmt., ¶ 95; Zuckerman Decl., Ex. S.) Prior to Plaintiff's leaving for vacation in April of 2001, ABN AMRO decided that it would need to terminate two employees from Kearney's department due to the ING acquisition. (Erbe Dep. Tr., 79:14–80:3; Baron Decl., Ex. U.) Plaintiff took part in a meeting with Erbe and Adam Young (co-head of ECM), at which it was determined that Tia Bryant and Douglass Ridgeway would be the two individuals terminated, and on March 23, 2001 Erbe created and sent to Moses via email a list

of employees recommended for termination, which included Bryant and Ridgeway but did not include Plaintiff. (Pl's Rule 56.1 Stmt., ¶ 99; Baron Decl., Exs. U, W, at 9.)

Subsequently, Moses told Erbe that AAR could use ING's general services department for administrative duties and Mulligan's team for compliance, and that Kearney should be discharged. (Pl's Rule 56.1 Stmt., ¶ 96; Erbe Dep. Tr., 77:16–21, 80:6–13; Baron Decl., Ex. W, at 9.) Defendant argues that Erbe asked Moses not to discharge Kearney because he liked her and wanted her to succeed. (Def's Rule 56.1 Stmt., ¶¶ 97–98; Erbe Dep. Tr. 77:8–11, 78:1–12.) Plaintiff denies that Erbe requested that she not be terminated. (Pl's Rule 56.1 Stmt., ¶ 97.) Moses then requested that Erbe take a harder look at his staff to find additional cost savings and also told him that a decision had been made to eliminate all "office manager positions" and by email dated April 12, 2001, Erbe sent Moses a list of ABN's "relevant redundancies" that included Plaintiff. (Baron Decl., Ex. X; Baron Decl., Ex. W, at 9.) Accordingly, Plaintiff was discharged a week later on April 28, 2001. (Pl's Rule 56.1 Stmt., ¶ 104.) Defendant contends that Moses was the sole decisionmaker with respect to terminating Kearney, while Plaintiff denies this and argues that Erbe was in fact the decisionmaker. (Def's Rule 56.1 Stmt., ¶¶ 102–03; Pl's Rule 56.1 Stmt., ¶¶ 102–03.)

## II. DISCUSSION

### A. Standard of Law

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *James v. New York Racing Ass'n*, 233 F.3d 149, 152 (2d Cir.2000). While a court must always "resolve ambiguities and draw reasonable inferences against the moving party," *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir.2002), "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007). Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 224 (2d Cir. 2006) (quoting Fed.R.Civ.P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. *Id.*

### B. Plaintiff's Pay Discrimination Claims

#### 1. The McDonnell Douglas Burden–Shifting Framework

█ Under the *McDonnell Douglas* burden-shifting framework for Title VII discrimination claims, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001) (citation omitted). The Plaintiff's burden at this stage is *de minimus*, and the requirement of meeting this burden "is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

■ Where a plaintiff is attempting to establish a *prima facie* case of disparate pay under Title VII "a plaintiff must show: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus." *Thomas v. iStar Financial, Inc.*, 438 F.Supp.2d 348, 367 (S.D.N.Y. 2006) (citing *Belfi v. Prendergast*, 191 F.3d 129, 140 (2d Cir.1999)).

■ If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 108 (2d Cir.2010) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). The burden at this stage is one of production, not persuasion, and thus "does not involve any determination of credibility." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir.1998) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The defendant must meet this burden by articulating a reason for the challenged conduct that "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742. Once the defendant meets this burden, the presumption of discrimination "drops out of the picture" and the burden of proof shifts back to the plaintiff. *Hicks*, 509 U.S. at 510–511, 113 S.Ct. 2742.

■ To prevail, a plaintiff must then show, without the benefit of the presumption, that the employer's action was in fact the result of racial discrimination. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir.2008). Plaintiff will survive summary judgment if it produces "evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole *or in part by* ... discrimination." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997), *cert. denied*, 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998) (emphasis added). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't. of C'mty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Here, Defendant contends that Plaintiff cannot satisfy n the "similarly situated" prong of a *prima facie* case. (Def's. Mem. of Law, 10.)

### 2. Whether there Exist Similarly Situated Comparators to Plaintiff

■ "[W]here a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001) (citing *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir.1997)). This means that "such an employee must be similarly situated in all material respects—not in all respects" and that "a plaintiff is not obligated to show disparate treatment of an identically situated employee." *Id.* at 54 (quoting *Shumway*, 118 F.3d at 64). "In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id.*

### i. The 1998 to Spring of 1999 Period

■ Plaintiff contends that during the 1998 to Spring of 1999 period, her position

was materially similar to that of four other investment bankers within the originations group of ECM: Alexander Dake, Rolando Springall, Vijay Karwal, and Esteban Skare, and that each was involved in targeting companies and government entities for new business, performing due diligence, and assembling and presenting materials to companies or government entities. (Plt's. Mem. of Law, 4.) Defendant acknowledges that Kearney took part in pitching bye gathering, consolidating, and formatting information for pitch books used during client pitch meetings. (Def's Mem. of Law, 3.)

Defendant contends, however, that Plaintiff's duties were materially different from these four comparators in two ways. First, Defendant argues that Plaintiff never performed any economic or market condition analyses reflected in the pitch books. (Def's Mem. of Law, 3.) This assertion is supported by Plaintiff's own testimony at her deposition, while discussing her role in creating the pitch books:

Q: "You, Ms. Kearney, weren't doing any independent economic analysis of your own, correct?

A: Of my own? No.

(Kearney Dep. Tr., 81:22–25.)

Q: "You didn't analyze raw data and come up with an independent analysis of market conditions, correct?

A: No.

(Kearney Dep. Tr. 83:9–12.)

Defendant further contends that unlike her four comparators, Plaintiff only attended one or two client pitch meetings, never took a lead role in any such meeting, never had overall responsibility for any such deal, and never "closed" any deal with a client. (Def's Mem. of Law, 3.) Indeed, Plaintiff stated at her deposition that she only attended "one or two" company pitches, and that although at those pitches she "added [her] thoughts once or twice," another ABN ANRO employee "actually conducted the meetings." (Kearney Dep. Tr. 126:14–23.) Further, she stated at her deposition:

Q: How many deals did you have overall responsibility for between 1997 and 1999?

A: None.

(Kearney Dep., Tr. 114:10–13.)

Q: Did you close any deals?

A: No.

(Kearney Dep., Tr. 165:20–21.)

In contrast, Plaintiff conceded at her deposition that the May 1997 ECM Business Plan showed that Alexander Dake had taken overall responsibility for closing origination deals, including twelve deals over which Dake had a lead role during May of 1997.[1] (Kearney Dep., Tr. 113:1— 114:25; Zuckerman Decl., Ex. H, at 259– 260.) Further, Rolando Springall often traveled for client pitch meetings, includ-

---

1. Although Plaintiff claims that her duties were the same as the four comparators during the 1998 to Spring of 1999 period, (Pl's Mem. of Law, 4), the Court finds that Alexander Dake's leading role in twelve origination deals during May of 1997 is nevertheless relevant because an employee's exceptional performance history, such as the leading role that Dake played during 1997, is an employment characteristic that should be considered in determining whether employees are similarly situated. *See, e.g., Trotman v. CBS Radio*

*Inc.*, 2007 WL 2827803, *9 (S.D.N.Y. Sep. 27, 2007) ("Among the factors to be considered in determining whether employees are similarly situated are their "specific duties, education, seniority, and *performance history* "") (emphasis added); *Wang v. N.Y.C. Dept. of Finance*, 1999 WL 529550, *19 (E.D.N.Y. Jul. 21, 1999) ("[D]isparity in prior performance history is another differentiating circumstance that defeat's [Plaintiff's] claim that she was similarly situated to [comparator.] ").

ing to take the lead role in presentations, and had engaged in economic valuation work for the pitches. (Kearney Dep., Tr. 124:17—125:8; Erbe Dep. Tr., 131:10–14, 20–21.) Similarly, Vijay Karwal was involved in preparing financial analysis and valuation work for the pitches, and would then travel and "drive and lead the process of pitching that business." (Erbe, Dep. Tr., 128:19–129:12.)[2] Finally, Esteban Skare had a six-year economics degree from the University of Buenos Aires, and attended multiple client pitches, including at least one, but possibly more, for which he took the lead responsibility. (Zuckerman Decl., Ex. K; Kearney Dep., Tr. 117:9–118:10; 127:13–24.) Kearney does not dispute or provide any evidence contrary to a finding that these four comparators were involved in economic analysis and valuation work and/or traveled to and took the lead in pitching and closing deals with potential clients. (Pl's Mem. of Law, 4, 16.)

While it is true that the responsibilities and duties of similarly situated employees need not be identical, they must be similar in all material respects. *McGuinness*, 263 F.3d at 53. Here, because Plaintiff, unlike her four comparators, did not engage in any independent economic analysis in preparation for the pitches, did not take a leading role in making client pitches or closing deals, and indeed only traveled for client pitches once or twice, the Court finds that no reasonable jury could find that Plaintiff was similarly situated to the four comparators in all material respects. *See Wali v. One Source Co.*, 678 F.Supp.2d 170, 181 (S.D.N.Y.2009) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.") (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001)). Accordingly, Plaintiff cannot establish a *prima facie* case of pay-discrimination for the 1998 to Spring of 1999 period.

### ii. The Spring of 1999 to Spring of 2001 Period.

■ Plaintiff also contends that from the Spring of 1999 to the Spring of 2001 period, her "duties were the same as the [two] comparable compliance officers," Paul Loomis and Robert Mulligan. (Pl's Mem. of Law, 16.) Defendant responds that although Mulligan and Loomis, like Plaintiff, performed compliance functions, "the scope of their duties was materially different than Kearney's." (Def's Mem. of Law, 12.)

First, as to Mulligan, Defendant argues that while Kearney was responsible for numerous compliance functions, including monitoring employee trading accounts, ensuring that employees were registered, conducting compliance seminars, monitoring research related to new equity issues, and managing firewalls, watch lists and restricted lists, Plaintiff was not responsible for substantive compliance functions, such as "providing advice concerning laws and regulations and interfacing with agency regulators on substantive matters," (Def's Mem. of Law, 5.) Plaintiff provides two ambiguous statements by Mr. Erbe and Mr. Van Schelle that could be taken to suggest that Plaintiff was involved in substantive compliance. (*See* Erbe Dep. Tr., 40:4–7) (stating that he consulted Plaintiff on "[r]egulatory issues surrounding new issue equity transactions, the watch list, the capital requirements, [and] general compliance questions); van Schelle Decl., ¶ 11 ("I consulted with Ms. Kearney when

---

**2.** Although some of the deposition transcripts in this matter refer to a "V.J. Carlo," it is obvious from the record, and the parties appear to agree, that all references to "V.J. Carlo" are actually misspellings of the name "Vijay Karwal."

compliance issues arose within the joint-venture."))

However, Erbe also makes clear that although he consulted with Plaintiff on compliance issues, it was with Mulligan that he would consult for "[t]he more complicated compliance issues surrounding public law and regulation. He was head of compliance, therefore, ultimately responsible for ABN AMRO acting in a compliant way around transactions, so complicated issues, important issues he would be brought in." (Erbe Dep. Tr., 47:11–17.) Further Carolyn Moses, ABN AMRO's then Chief Executive Officer and Head of Equities and Investment Banking Group of the United States, (Moses Decl., ¶ 3), declares that as "Chief Compliance Officer for AAR, Kearney's duties were primarily administrative in nature" while "[s]ubstantive compliance functions for AAR, such as interpreting and providing advice concerning laws and regulations and interfacing with agency regulators on substantive matters was performed by ABN AMRO's Compliance Department headed by Robert Mulligan." (Moses Decl., ¶¶ 14–15) Accordingly, the Court finds that whether or not the compliance matters with which Plaintiff dealt should be termed "substantive" or not, it appears from the record that there was a clear qualitative difference between the types of compliance issues with which Plaintiff and Mulligan regularly dealt.

In addition to the qualitative differences in their compliance responsibilities, Mulligan also oversaw more than 100 employees as the head of ABN AMRO compliance in New York, while Plaintiff oversaw only about 20 employees as Chief Compliance Officer at AAR. (Kearney Dep. Tr., 136:12–20; 137:7–11; 179:9–12.) For these reasons, the Court finds that no reasonable jury could find that Plaintiff and Mulligan were similarly situated in all material respects.

With regard to Loomis, the parties agree that he assumed Plaintiff's position and many of her responsibilities upon her termination in April of 2001. (*See* Erbe Dep. Tr., 51:1–14 (explaining that Erbe consulted Loomis on many of the same issues that he consulted Plaintiff); McDonald Dep. Tr., 43:9–11 (noting that Paul Loomis was a compliance officer with responsibility for AAR.)) Generally, an individual who assumes a Plaintiff's position and responsibilities would be an appropriate candidate for a similarly situated employee. However, Loomis' employment history shows that he was responsible not only for compliance at AAR but also at ABN AMRO's Fixed Income Group. (*See,* Zuckerman Decl., Exh. N, at 220.) In contrast, while Plaintiff also performed additional responsibilities while she was Director of Compliance at AAR, these additional responsibilities were administrative in nature, and took up about one fourth of her time. (Kearney Dep. Tr., 146:6–9.)

Because neither party has directed the Court to any evidence of precisely what compliance duties Loomis was responsible for in his role with ABN AMRO's Fixed Income Group, Plaintiff's only recourse is to argue that a jury could reasonably infer that Loomis' additional compliance responsibilities with the Fixed Income Group were either negligible or at least comparable to Plaintiff's additional administrative responsibilities to make the two similarly situated and raise an inference of discrimination. (Pl's Mem. of Law, 16.) ("At best, there are disputed issues of material fact concerning Ms. Kearney's duties as compared to her male counterparts.") While the Court must draw all reasonable inferences in favor of the Plaintiff, it need not engage in conjecture or speculation, and in order to avoid summary judgment it remains the Plaintiff's burden to raise issues of material fact as to each of the elements of a *prima facie* case. Because the Defen-

dant "has documented particular facts in the record"—namely, that in addition to Plaintiff's duties, Loomis also had responsibilities for compliance with ABN AMRO's Fixed Income Group—"the opposing party must [now] 'set forth specific facts showing that there is a genuine issue for trial.'" *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 224 (2d Cir. 2006). This Plaintiff has not done. Accordingly, the Court finds that Plaintiff cannot establish a *prima facie* case of pay discrimination for the Spring of 1999 to the Spring of 2001 period.

### C. Plaintiff's Claim of Discriminatory Discharge

■ To establish a claim of discriminatory discharge, a Plaintiff must make out a *prima facie* case of sex or age discrimination by showing "that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491–92 (2d Cir.2010). Once a Plaintiff has made out a *prima facie* case of discrimination, the remainder of the *McDonnell Douglas* framework applies to the Court's analysis. *Id.* at 491.

■ Here, Plaintiff has established a *prima facie* case of age and of sex discrimination, based on the fact that she was replaced by Loomis, a man who, unlike her, was under the age of 40, (Baron Decl., Ex. Q, R, W, at 9; Erbe Dep. Tr., 51:1–14), thus giving rise to an inference of both age and sex discrimination. *See Bailey v. Synthes*, 295 F.Supp.2d 344, 355 (S.D.N.Y. 2003) ("Replacement by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis.")(quoting *Zimmermann v. Associates*

*First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001)).

■ However, Defendant has rebutted the presumption of discrimination by providing a legitimate non-discriminatory basis for Plaintiff's termination based on Defendant's acquisition of ING Barings and the resulting termination of 168 employees in April of 2001, including Plaintiff, due to the redundancy of her administrative and compliance functions. (Pl's Rule 56.1 Stmt., ¶¶ 106–07) (conceding that she was told she was being terminated "due to the ... transaction with ING Barings" and the subsequent "restructuring" and that she told her subsequent employer that her position was eliminated due to downsizing after the ING transaction.)

As to Plaintiff's claim of sex discrimination, regardless of whether the decision to terminate Plaintiff was made by Erbe, Moses, or some combination of the two, there is no evidence whatsoever in the record that would "allow a rational factfinder to infer that [ABN AMRO] was actually motivated in whole or in part by ... [sex] discrimination." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997), *cert. denied*, 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998) (emphasis added).

■ As to Plaintiff's age discrimination claim, the evidence demonstrates an issue of fact as to whether Erbe made an age-related comment to Plaintiff, in which he allegedly told her that "only the young ones" would be receiving a raise. (Kearney Dep. Tr., 208:11–16.) However, although Defendant denies that Erbe made such a comment, even if Erbe had done so, "evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, [unless] that stray comment ... bear[s] a more ominous significance when considered within the totality of all the evidence." *Carlton v. Mystic*

*Transp., Inc.,* 202 F.3d 129, 136 (2d Cir. 2000).

In *Carlton,* the Circuit Court found that a stray comment furnished support for a claim of age discrimination because the Plaintiff, who was 57, was replaced by two employees who were 18 and 25 years his junior, respectively. Further, the comment, that Plaintiff should "retire," was issued by the very person responsible for Plaintiff's termination, in the context of Plaintiff's termination meeting. *Id.* at 135–37. Here, by contrast, the 44 year-old Plaintiff was replaced by someone a mere six years younger than she, the alleged stray comment was issued in an earlier context unrelated to Plaintiff's termination, and was issued by an individual who uncontroverted evidence shows took steps to protect Plaintiff's job, (*see* Erbe Dep. Tr. 77:8–11, 78:1–12; Moses Decl., ¶ 19), and was not the final decisionmaker in Plaintiff's termination, (*see* Erbe Dep. Tr. 77:3–5; Moses Decl., ¶ 22). As a result, the Court finds that this single stray remark, within the totality of all evidence, does not evince any hint of discriminatory animus sufficient for a rational jury to find that Defendant's legitimate non-discriminatory reason for Plaintiff's termination was mere pretext. Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's discrimination claims.

### D. Plaintiff's Claim of Retaliatory Discharge

■ To establish a *prima facie* case of retaliation under Title VII, a plaintiff must adduce evidence sufficient to show "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse action." *Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 552 (2d Cir.2010) (cit-

ing *Patane v. Clark,* 508 F.3d 106, 115 (2d Cir.2007)). Once a Plaintiff has made out a *prima facie* case of discrimination, the remainder of the *McDonnell Douglas* framework applies to the Court's analysis. *Id.* Here, Plaintiff has not provided evidence that would allow a factfinder to determine that she has engaged in protected activity and thus satisfied the first element of a *prima facie* case of retaliation.

■ "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (citing 42 U.S.C. § 2000e-3). Because "[a]n employer retaliates when it attempts to stifle allegations of illegality or punish those making accusations[,] [i]t follows that an employer must have notice that a plaintiff opposed conduct prohibited by the statute." *International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC,* 470 F.Supp.2d 345, 357 (S.D.N.Y.2007) (citing *Galdieri-Ambrosini v. Nat'l Realty and Dev't Corp.,* 136 F.3d 276, 292 (2d Cir.1998)).

■ Here, there is no evidence in the record to show that when Plaintiff complained about her salary, she gave Defendant notice that she was opposing conduct allegedly prohibited by statute. At her deposition, Plaintiff described each of the occasions when she complained to Erbe or others about her salary, and never once recalled complaining that she was being paid insufficiently because of her sex or age. (Kearney Dep. Tr., 207:2—215:25.) Indeed, in her Memoranda of Law, Plaintiff does not even contest Defendant's assertion that she did not give Defendant notice that she was complaining about her salary because she believed she was being discriminated against on the basis of age or sex. Accordingly, because Plaintiff cannot establish that she engaged in protected activity under Title VII, the Court grants

Defendant's Motion for Summary Judgment on Plaintiff's retaliation claims.

**E.  Exercise of Supplemental Jurisdiction**

 Because Plaintiff's federal claims are without merit, and because the matter is not brought under the Court's diversity jurisdiction, it is appropriate for the Court to dismiss the remaining state claims for lack of subject-matter jurisdiction. *See, e.g., New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 119 (2d Cir.2007) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.")

## III.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  Plaintiff's federal claims are dismissed with prejudice.  Plaintiff's remaining state claims are dismissed without prejudice.  The Clerk of Court is directed to CLOSE the Docket in this case.

SO ORDERED.